Brittingham & Hixon Lumber Co. vs. Manson.

BRITTINGHAM & HIXON LUMBER COMPANY, Appellant, vs. MANSON, Respondent.

*November 1 — November 16, 1900.*

*Logs and lumber: Sale: Construction of contract.*

Plaintiff, dealing extensively in lumber, needed to have engagements in advance for large quantities to meet its trade and contracts. Defendant, who owned a mill and the timber on a large tract, was unwilling to sell the standing timber, but was willing to negotiate for the manufacture and sale of all the product thereof. With a mutual understanding of these facts, they made a written contract by which defendant sold to plaintiff all of the merchantable lumber "that shall hereafter be cut and manufactured from the timber to be cut, logged, and removed from" the tract mentioned, "which said timber upon said lands is and was estimated at seventeen million feet, more or less." The contract provided that "the lumber hereby sold . . . shall be cut and manufactured at" defendant's mill "within three years from this date, in about equal amounts of one third to be manufactured each sawing season for the years 1898, 1899, and 1900, and delivered each year: provided that in case said mill should be destroyed by fire . . . the said lumber, or the amount then remaining unmanufactured, shall be manufactured at some other suitable mill." Payment was to be made by plaintiff, first, of the contract price of the standing timber to the parties from whom defendant had purchased it; second, the advances made by one W. for its logging and manufacture; and the balance to defendant. A man was to be employed to look after the grading and shipping of the lumber, his wages to be paid one half by each party; and the lumber was to be manufactured under the direction of plaintiff, provided that such direction should not interfere with the cutting capacity of the mill. During each of the years 1898 and 1899 the defendant manufactured and delivered substantially one third of the total amount of lumber contained in all of said timber, but thereafter refused to manufacture and deliver the remainder. *Held,* that the contract was for the sale of all the timber capable of being manufactured from the entire body of lumber described, and plaintiff was entitled to recover its damages for the breach thereof.

APPEAL from an order of the circuit court for Marathon county: W. C. SILVERTHORN, Circuit Judge. *Reversed.*

Appeal by plaintiff from an order sustaining a general demurrer to the complaint, which set forth substantially the following facts:

Plaintiff was engaged in an extensive wholesale and retail lumber business, in which it was its custom to contract for and purchase large quantities of lumber, in order that it might have in advance a fixed and sufficient supply to meet its trade and contracts, to the knowledge of the defendant. Prior to September 13, 1897, plaintiff endeavored to purchase from defendant all of the pine timber upon the lands described in the contract hereafter mentioned. Defendant was unwilling to sell the standing timber, but expressed a willingness to negotiate for the manufacture and sale of all of the product thereof. After sundry negotiations therefor, a written contract was entered into between the parties on October 14, 1897, whereby the defendant, as party of the first part, granted and sold to plaintiff, party of the second part, "all of the merchantable white pine and Norway lumber, lath, and shingles, which are to be manufactured and piled in the mill yard at the Manson mill, in Wausau, Wisconsin, that shall hereafter be cut and manufactured from the timber to be cut, logged, and removed from the lands known," etc. (description), "which said timber upon said lands is and was estimated at seventeen million feet, more or less. . . . That the lumber hereby sold and purchased by the party of the second part shall be cut and manufactured at the Manson mill, in the city of Wausau, Marathon county, Wisconsin, within three years from this date, in about equal amounts of one third to be manufactured each sawing season for the years 1898, 1899, and 1900, and delivered each year: provided, that in case said Manson mill should be destroyed by fire, or rendered otherwise unfit for the manufacture of said lumber, the said lumber, or the amount then remaining unmanufactured, shall be manufactured at some other suitable mill in Wausau, Wisconsin."

The contract then provided for piling, measuring, and inspecting the lumber, and for payment by the purchaser, first, of the contract price of the standing timber to the parties from whom the defendant had purchased it; second, to one Warne such sum as defendant might owe him for advances for logging, etc.; and the balance to defendant. Also, that a man should be employed to grade and look after the shipping of the lumber, and look after the mutual interests of each party; his wages to be paid one half by each. Further, that the lumber should be manufactured under the direction of plaintiff, provided that such direction should not interfere with the cutting capacity of the mill.

On the same day another contract was made between the same parties, which is set out in the complaint, reciting "that whereas the said *Manson* has this day entered into a contract with said lumber company for the sale of a quantity of lumber, by contract in writing bearing even date herewith," wherefore a price was made at which said *Manson* would load and grade the lumber.

The defendant, in pursuance and part execution of the contract, cut, logged, and manufactured into lumber, lath, and shingles, and delivered, during the years 1898 and 1899, about 12,500,000 feet of such timber, and in addition thereto, and prior to March 1, 1900, cut, logged, and removed from the lands about 4,000,000 feet, leaving standing thereon about 5,000,000. The 4,000,000 feet cut and removed, but not sawed and delivered, contained about 5,000,000 feet of merchantable lumber, and about 2,000,000 pieces of lath and shingles. The remaining standing timber contained about 6,000,000 feet of merchantable lumber, and about 2,000,000 feet of lath and shingles. On the 26th day of March defendant repudiated the contract, and refused to manufacture or to deliver to plaintiff any of the timber so cut and removed by him, and refused to cut or manufacture any of that remaining on the land, and about that time conveyed away said logs and standing timber, as also his mill.

The complaint alleges that up to the time of said breach
defendant at all times, in conversation and correspondence,
assumed that he was bound to deliver to plaintiff all of the
lumber, lath, and shingles contained in all of the pine tim-
ber which stood upon the lands at the time of making the
contract.   The price of lumber, etc., mentioned in the con-
tract has continuously been higher since the beginning of
the sawing season of 1898 than the prices specified in said
contract, and by reason of the breach the plaintiff has sus-
tained damages in the sum of $50,000, recovery of which is
prayed.

For the appellant there was a brief by *Olin & Butler*, at-
torneys, and *Mylrea & Bird*, of counsel, and oral argument
by *H. L. Butler* and *C. B. Bird*.

For the respondent there was a brief by *Ryan, Hurley &
Jones*, attorneys, and *Van Hecke & Smart*, of counsel, and
oral argument by *T. C. Ryan* and *M. A. Hurley*.

DODGE, J.   The respective parties present antagonistic
views as to the force and effect of the contract set forth in
the complaint.   The plaintiff contends that thereby defend-
ant agreed to deliver to it all of the lumber, lath, and shin-
gles which could be manufactured from all of the timber
upon the lands mentioned, within three years from the date
of the agreement, approximately one third each year, so that
it was an entire contract to deliver to it, in approximately
equal thirds in each of these three years, the entire product
of all the pine timber,— so definite in its scope and time of
performance that breach thereof gave an immediate right
of action for damages, to be measured by the difference be-
tween the contract price and market value of any portion
of such lumber which remained undelivered.   Defendant, on
the other hand, contends that this is merely a contract bind-
ing the plaintiff to receive and pay for any lumber which
the defendant might elect to manufacture from the standing
timber in question, but binding the defendant to deliver

only such as, in his election, he might choose to manufacture, and at such times as he might so choose, and therefore terminable at his will, without liability for damages.

The most important rules for the construction of contracts are: The primal and all-important object in the consideration of any written contract is to ascertain the intention which the parties actually had and sought to express. In the effort to reach such result, all parts of the contract must be taken into consideration with reference to each other, and, if possible, such an interpretation of each part be adopted as will be consistent with and give effect to every other part. The intention of the parties must be ascertained from the language of the contract itself, but it is proper and often necessary that the court should be informed as to the subject matter contracted about, the relation of the parties thereto, and the circumstances surrounding the transaction,— in other words, should be placed in the same position that the parties occupied when the contract was put in words, so as to be able to view the terms thereof in the same light in which the parties did. *Robson v. Miss. River L. Co.* 43 Fed. Rep. 369; *U. S. v. Peck*, 102 U. S. 64; *Lyman v. Babcock*, 40 Wis. 503; *State ex rel. Heiden v. Ryan*, 99 Wis. 123. In *Lyman v. Babcock, supra*, it was said: "Whatever, therefore, indicates the nature of the subject, is a just medium of interpretation of the language and meaning of the parties in relation to it, and is also a just foundation for giving the instrument an interpretation, when considered relatively, different from that which it would receive if considered in the abstract." In the *Heiden Case*, as to the construction of statutes, it was said: "Uncertainty of sense, requiring judicial construction, does not always spring from uncertainty of expression. Words may be plain, yet their literal meaning lead to such consequences that courts must necessarily violate the letter in order to reach the real spirit of the law and give effect to the legislative will."

Brittingham & Hixon Lumber Co. vs. Manson.

In the light of the last of the three rules of construction above stated, it becomes proper to consider the allegations of the complaint as to the situation of the parties at the time of making the contract. From those it appears that the plaintiff, a lumber dealer, was under the necessity of having engagements reasonably definite for considerable amounts of lumber in advance, for the purposes of its business; that the defendant was the owner of this tract of timber and of a mill; that he was unwilling to sell the timber alone, but desired to dispose of it in such a manner as to utilize his mill property; and that the parties met and negotiated upon mutual understanding of those circumstances. From this foundation, proceeding to the contract set out in the statement of facts above, it is well-nigh inconceivable that the plaintiff would have entered into a contract whereby, entirely at the caprice of the defendant, it might have forced upon it a wholly unknown quantity of lumber, varying from a mere trifle to the entire capacity of defendant's mill, which, from the allegations of the complaint, appears to have equaled or exceeded 6,000,000 feet per season, without any notice beforehand to enable it to graduate its contracts for sales according to the lumber to be received. Further, the knowledge of this situation gives especial cogency and significance to the provisions of the contract declaring that the timber in contemplation amounted to about 17,000,000 feet, and that the same should be cut and manufactured within three years, and that approximately one third thereof should be so manufactured and delivered each year. These latter elements of the contract, the respondent insists, may be considered so insignificant and their presence so accidental as to justify the court in ignoring them altogether as surplusage. It is entirely possible that words in a contract inconsistent with others may so clearly appear to have been carelessly used or to serve no important purpose that a court need not hesitate in giving an apparently correct interpre-

tation to the other words inconsistent therewith. But, in weighing the relative importance of conflicting provisions, the situation of the parties is specially significant, and in the present case leaves no room to doubt that the stipulations as to time and rate of delivery were most carefully considered and deemed highly important by both parties. Upon them the plaintiff must regulate its commercial business, and defendant the operation of his mill and the size of his logging outfit.

Defendant's position, that the words, "all the merchantable lumber that shall hereafter be cut and manufactured from the timber to be cut and removed from the lands in question," means only such as shall happen to be manufactured in his election, be it little or much, is absolutely inconsistent with the above-mentioned provision that "the lumber hereby sold and purchased by the party of the second part shall be cut and manufactured at the *Manson* mill within three years from this date, in about equal amounts of about one third to be manufactured each sawing season for the years 1898, 1899, and 1900." Those words, if used deliberately in this contract, as we are convinced they were, could not have been used unless the minds of the parties had already settled upon the proposition that an approximately definite aggregate of property had been sold by the previous words; otherwise, the phrase is wholly incapable of enforcement, for the plaintiff could not establish, at the end of the sawing season in any of the three years named, whether it had been complied with or not. No breach could be predicated if it got but 1,000 feet of lumber in either of those years. Again, the provision that "in case of the destruction of said *Manson* mill the said lumber, or the amount then remaining unmanufactured, shall be manufactured at some other suitable mill," is wholly meaningless, unless the parties understood that some definite and specified lumber had been sold and was to be manufactured.

Especially significant are the words, "or the amount then remaining unmanufactured;" for, if no particular amount had been sold, then there could be no amount to remain unmanufactured. The effect of these provisions, without considering others, is to establish beyond reasonable doubt that the earlier words in the contract did not mean a wholly uncertain, indefinite, or accidental amount of lumber, but did mean a quantity of lumber reasonably ascertained in identity and amount. That view being reached, all of the other clauses of the contract fall into harmony, and are consistent with a well-understood purpose and intent of both parties in making the contract. Then becomes intelligible and significant the estimate of 17,000,000 feet; the provision as to the division of the payments for all of said lumber, whereby is to be paid, first, the stumpage price to the parties from whom defendant purchased it; second, the advances made by one John Warne for its logging and manufacture; *and the balance* to defendant. Then it is possible to believe that intelligent men would agree to hire and share the wages of a man to look after the shipping and grading, and insert the provision that the plaintiff should have the right to direct the process of manufacture, with no limitation except that it should not interfere with the cutting capacity of the mill. This last proviso, obviously included in the contract at defendant's instance, is extremely significant of his understanding that he had contracted to cut and deliver a large and reasonably definite quantity of lumber, and was willing to surrender the direction as to how his mill should work thereon, provided it did not diminish its earnings by lessening its output. It is utterly inconsistent with his counsel's theory that manufacturing was intended to be entirely optional with defendant, for it vests option in plaintiff.

If we are correct thus far, namely, that the words of grant in the contract were intended by both parties to describe some definite and ascertainable quantity of lumber, sold by

defendant to plaintiff, it only remains to ascertain what that quantity was. That is not difficult, in the light of the surrounding circumstances. There is nothing to indicate any other quantity or volume than the lumber to be obtained from *all* of the timber standing on the lands in question. The estimate which had previously been made of such timber; the attachment and incorporation in this agreement of the contracts with the parties from whom defendant had purchased the stumpage, and to whom plaintiff was to pay the price thereof out of the lumber delivered; indeed, the very designation of the land from which such timber was to be cut,— all these indicate that quantity, and no other. Further, and most cogent as bearing upon defendant's understanding, is the fact that in each of the years 1898 and 1899 he did deliver substantially one third of the total amount of lumber contained in all of said timber. Much stress is laid by the circuit judge, in an opinion filed by him, upon the fact that the quantity, approximately 6,000,000 feet per year, was an extraordinary quantity for one establishment to handle, and therefore improbable. He must have overlooked the fact, alleged in the complaint, that for two of the contractual three years defendant's mill did handle such amount. Whether it was run exclusively upon this timber or not is not alleged, but certainly the contract, thus construed, was not in excess of the capacity of defendant, either in logging or in manufacturing.

A contract having many elements of similarity with the one now before us was considered by Judge SHIRAS in *Robson v. Miss. River L. Co.* 43 Fed. Rep. 364, and again, after judgment, in 61 Fed. Rep. 893. There a contract by a log-driving and booming company with the owner of considerable tracts of lands tributary to their river provided that they should drive logs for him, not exceeding a specified amount each year, at a given price. The facts of the situation were recited under a "whereas" in the contract. There

was no specification as to the duration of the contract or as to the quantity; but the court held, from the situation alone, that it was a contract to drive and boom all the logs which the plaintiff had upon his then-owned premises; and upon a repudiation thereof while he still had some 40,000,000 feet undriven, part cut and part not yet cut, he was held entitled to recover as damages the increased expense imposed upon him for driving and booming his remaining logs,— both those which he had cut and tendered at the river, and those which still remained standing.

In the view we have taken of the necessary construction of the words used in this contract in the light of the surrounding circumstances, it becomes immaterial to consider the question — much discussed by defendant — whether the contract, upon his interpretation thereof, would be of any validity; whether it would contain any element of obligation on defendant's part sufficient to constitute mutuality. Suffice it to say that in the two very recent cases of *Hoffman v. Maffioli*, 104 Wis. 630, and *Teipel v. Meyer*, 106 Wis. 41, neither of which is cited by counsel, the subject of mutuality necessary to the validity of contracts, and the authorities bearing thereon, are so fully discussed that respondent's citation of numerous decisions from other states was hardly necessary.

Conceding that the contract as interpreted by respondent would be valid, we find that interpretation violative of the most important stipulations of the writing itself, inconsistent with the situation and needs of the parties, and opposed to their obvious purpose and intention. On the contrary, the language of that writing, in the light of the conditions under which it was used, declares a meeting of minds upon an agreement for the purchase and sale of all the lumber capable of being manufactured from the entire body of timber described. Such being the contract, the complaint clearly alleges a completed violation thereof by defendant,

and resulting damage to plaintiff. The contract, its breach, and damages therefrom, are facts sufficient to constitute a cause of action. The demurrer was erroneously sustained.

*By the Court.*— The order of the circuit court is reversed, and the cause remanded with directions to overrule the demurrer.