THE CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAIL-WAY COMPANY, Appellant, vs. THE CHICAGO, MILWAU-KEE & ST. PAUL RAILWAY COMPANY, Respondent.

*November 8, 1901—February 18, 1902.*

*Railroads: Construction and maintenance: Railroad crossings: Construction of contracts: "Interlocking system:" "Other similar appliances:" Parol evidence: Specific performance: Equity.*

1. Defendant's railway crossed the tracks of plaintiff's railway at grade, the crossing having been constructed under a contract which required defendant, "in case flagmen or switchmen are required at or by reason of such crossing," to pay "the entire hire of such flagmen or switchmen and also the entire cost and expense of constructing and maintaining all watch houses, signal stations, signals, and other similar appliances that may be now or at any time hereafter required." Plaintiff brought its action for specific performance of such contract, alleging a change of transportation methods since the contract was made, and that, in order to secure reasonable safety to its trains in passing over the crossing without stopping, it was necessary to construct the "interlocking system" of crossings. This sys-

tem consists of derailing switches interlocked with each other, connected with levers in a tower house, from whence they are operated. The crossing in question was remote from settlement or habitation, and the evidence showed that no flagman or switchman, within any reasonable meaning of those words, had ever been required at or by reason of the crossing. *Held*, that the contingency had not arisen which, by the contract, was to impose on defendant the expense of flagmen, watchmen, watch houses, signal stations, or signals, and hence that no duty had arisen which could be compelled by a specific performance of the contract.

2. In such action it appeared that the contract related to a particular trade or calling, having a terminology of its own; that ambiguity existed, needing evidence to clear it up; that the situation and circumstances surrounding the contract needed to be ascertained; and that the words of the contract were to be applied to facts ascertainable only by extrinsic evidence. *Held*, that on the question whether an "interlocking system" was within the calls of the expression "other similar appliances," there were presented subjects of which the court, by the aid of parol evidence, became a trior of facts, and its decision thereon, in the absence of mistake, oversight, or prejudice, is conclusive on appeal.

3. While the ultimate object of the "interlocking system" is safety, the main purpose of its installation is to avoid stopping trains, consistently with safety, and under a contract executed when the statute required all trains, in any event, to stop at all railway crossings, the "interlocking system" is not necessarily a "similar appliance" within the calls of said contract.

4. In such case the words "other similar appliances" are reasonably attributable to providing for subsequent discovery or invention, and cannot be held meaningless because nothing to which they can apply has yet been generally adopted by railroads.

5. Where under a contract the party having the burden of performance has not agreed to do anything until "required," and it appears that the other party has not demanded performance except in a respect held not to be within the calls of the contract, the court will not, in advance, announce the various duties which may be imposed thereunder.

MARSHALL, J., dissents.

APPEAL from a judgment of the circuit court for Eau Claire county: JAMES O'NEILL, Circuit Judge. *Affirmed.*

Suit for specific performance of contract made November

20, 1884, between the parties, recognizing application by the defendant, and consent by the plaintiff, that the former should cross the tracks of the latter at a point designated, near Eau Claire, upon the following terms and conditions:

"First. The cost of making and maintaining said crossing shall be wholly paid by the party of the second part, and said crossing shall be made and maintained in the best manner.

"Second. In case the party of the first part shall hereafter desire to construct additional tracks upon its line of railway at the point of crossing aforesaid, the party of the second part agrees to construct and maintain a crossing over such additional tracks in the same manner and on the same terms as herein provided in reference to the present tracks of the party of the first part at that point.

"Third. The passenger trains of the first party shall have preference over the passenger and freight trains of the second party, and the freight trains of the first party shall have preference over the freight trains [of] the second party, in passing over the said crossing when arriving there at the same time; but the passenger trains of the second party shall have preference over the freight trains of the first party in passing over said crossing.

"Fourth. In case flagmen or switchmen are required at and by reason of the said crossing, the said second party shall pay the entire cost of such flagmen or watchmen, and also the entire cost and expense of constructing and maintaining all watch houses, signal stations, signals, and other similar appliances that may be now or at any time hereafter required."

Under this contract the crossing had been put in and had been maintained ever since by the defendant. No kind of signals or precautions had been maintained at said crossing thenceforward, except that both companies had been under the requirement of the law that they should stop all trains before crossing.

The complaint alleged that since the making of that contract traffic had greatly increased, and the size and weight

of engines, cars, and trains had been enlarged, greatly en-
hancing the difficulty and expense of stoppage of trains and
the danger of crossings; also that greatly increased speed of
trains had been rendered necessary by a change of condi-
tions and demands of the public, and that great inconven-
ience and hardship to the plaintiff and to the public re-
sulted from bringing its trains to a full stop at crossings;
that a system known as the "interlocking system" is the
best known device for safety, and the only one insuring
reasonable safety and enabling trains to pass over crossings
without stopping; that plaintiff has within two or three years
last past repeatedly demanded of the defendant that it con-
struct such interlocking device or system at the crossing in
question, which it refuses to do, insisting that it is under
no obligation to establish such system, although admitting
that it is the best known device in use for safeguarding such
crossings.

After extended trial the court found that such interlock-
ing system is the best known device; that it was not in gen-
eral use in Western states at the time of the contract, but
was in use elsewhere, and was well known to railroad men,
and was then generally known and designated by the name
"interlocking system or safety device"; that it is necessary
to establish and maintain it at the crossing in question; and
that demand had been made upon the defendant and refused.
The interlocking system, so called, costs about $2,000, and
consists of "(1) a mechanical arrangement known as 'inter-
locking,' by means of which the signals and derailing
switches are connected with the levers, and interlocked
with each other, in a central building, located near the cross-
ing, called an 'interlocking cabin or tower,' and controlled
by an operative located therein; (2) a system of derailing
switches located in each track, by means of which, when it is
desired to clear one railroad for the passage of trains, the
derail switches on that line are closed, and those on the other

railroad are opened, so that if, while a train is passing over
the crossing on the track that is cleared, a train should ap-
proach on the other railroad and disregard the danger signals,
it would be derailed before reaching the crossing; and (3)
a system of home and distant semaphore signals, controlled
and operated by the man in the tower by means of the inter-
locking mechanism." The court found as fact that the first
paragraph of the conditions of said contract referred merely
to the construction of the physical crossing structure, and
was not understood or intended by the parties to embrace
an interlocking device or system. The court also found
from the evidence and the situation and circumstances ex-
isting at the time said contract was made that the fourth
paragraph contemplated any methods of protecting the safety
of trains, but did not at the time of the contract, and does
not now, refer to, embrace, and include an interlocking
device or system, and was not so intended or understood by
the parties. It appeared in the evidence that the machine
known as the "interlocking device" had no physical connec-
tion with the crossing proper; that it was an expensive estab-
lishment, costing $2,000 or $2,500; that the defendant ran
no trains over the road of such weight or speed as to make
stoppage for the crossing seriously burdensome to it, while,
on the other hand, the plaintiff's main line, over which some
of its fastest passenger and mail trains were run, was seri-
ously incommoded and burdened by the necessity of stop-
page thereof. A large amount of testimony was taken to
show generally that there were various signals used by dif-
ferent railroads for safety at crossings where trains were
obliged to stop and ascertain the absence of trains on the
other road; such methods being the presence of flagmen, the
presence of gates, the presence of semaphore signals, and, in
the Eastern states, what is known as the "ball signal,"—
none of them, however, adapted to or enabling the safe run-
ning of trains over the crossing without stopping. Judgment

was rendered in favor of the defendant on the merits, from which judgment plaintiff appeals.

For the appellant there were briefs by *H. L. Humphrey* and *Thomas Wilson,* and oral argument by *Mr. Wilson.*

For the respondent there was a brief by *Geo. R. Peck* and *Burton Hanson,* attorneys, and *H. H. Field,* of counsel, and oral argument by *Mr. Hanson.*

The following opinion was filed November 29, 1901:

DODGE, J.    This case was argued with great vigor, ability, and refinement by counsel upon both sides, invoking most of the well-known rules for construction of contracts, which, however, in the ultimate analysis, all come to the proposition that the duty of every court in the construction of a contract is to ascertain the intention of the parties; limited, however, in so doing, to the language of the contract, read in the light of the surrounding circumstances, and purposes presumably in the minds of the parties at the time of reducing their agreement to writing.  *Heryford v. Davis,* 102 U. S. 235, 243; *Brittingham & H. L. Co. v. Manson,* 108 Wis. 221, 225.

The situation at the time of making the contract under consideration was that of the respondent exercising its right by statute to cross the existing railway of the plaintiff at a point remote from settlement or habitation.    It had a right to do this by putting in and maintaining the physical crossing, and by paying such sum as might be fixed by commissioners in a proceeding under subd. 6, sec. 1828, Stats. 1898, which was the same in 1884 as it is now.    By the agreement between the parties, the duty to put in and maintain the physical crossing was, as under the statute, to be borne by the respondent.    That duty was subject to increase as the appellant, in its discretion, might desire to put in additional tracks.    This was the extent of the obligation assumed by the respondent, except in one contingency,

namely, that specified in the fourth section of the contract,—"in case flagmen or switchmen are required at or by reason of said crossing." Then, and then only, were certain expenses to be paid, namely, the hire of "such flagmen or watchmen," etc. It is probable that the word "switchmen," in the first clause, was intended to be "watchmen," since it is rendered entirely apparent by the evidence that a man whose duty it was to attend upon a crossing would be called a "watchman" or "flagman." But, waiving that consideration, if the word "switchmen" was intentionally used, as perhaps we must presume, their function would doubtless be in connection with the possibility contemplated by the crossing statute above referred to, that there might be put in certain turn-outs, sidings, switches, and other conveniences in furtherance of the object of the connection. A mass of evidence was introduced bearing upon the functions of various men employed at railroad crossings, and the appliances used by them, as also with reference to the names used to describe both the employees and their implements. That evidence renders certain, beyond dispute, that, within railroad terminology, neither the designation "flagmen," "switchmen," nor "watchmen," would ever be used or understood to describe or include operators of interlocking plants. Although such operator does perform the duties of a watchman, in that he looks out for trains; duties of a flagman or signalman, in that he signals approaching trains; and of a switchman, in that he opens and closes the derailing devices, often called "switches,"—yet the plant which he operates is so distinguished by its purpose, its method of construction, and its importance that he is always distinguished in designation by reference to the plant so operated, and never confused with flagmen, watchmen, or switchmen. Nor can we discover in the surrounding circumstances anything to warrant belief that the parties intended by these words more than their ordinary import in railroad parlance. It therefore

would seem clear that the contingency has never arisen which by the contract was to impose on the defendant the expenses specified in the fourth paragraph; that no flagman, switchman, or watchman, within any reasonable meaning of those words, has ever been required at or by reason of this crossing; hence that no duty has arisen to do the acts sought to be compelled in this action by a decree of specific performance.

This conclusion, based upon the very words of the contract, makes unnecessary consideration or decision of the very extensively discussed question whether an interlocking plant falls within the calls of the contract for "all watch houses, signal stations, signals, and other similar appliances that may now or at any time hereafter be required," or whether it is so differentiated therefrom as to be dissimilar, instead of similar. That question would involve so extended investigation and so many conflicting considerations that we cannot justify ourselves in entering upon it, although fully debated, and apparently deemed the crucial one by the circuit court. The judgment of that court was right, however this latter question be resolved.

*By the Court.*—Judgment affirmed.

MARSHALL, J., dissents.

The appellant moved for a rehearing, and the following opinion was filed February 18, 1902:

DODGE, J., By the former opinion this case was disposed of, and the judgment affirmed on the ground that until plaintiff required of defendant a flagman, switchman, or watchman, no duty rested upon the latter to employ such men, or to erect and maintain the structures and appliances specified in the contract, and that no such requirement had yet been made. That served to affirm the judgment, and the

further question whether, when that condition precedent oc-
curred, an interlocking plant would be included within such
structures and appliances, while fully considered by the
court, was not treated, as not affecting the result.  Upon a
review of the case upon motion for rehearing, it is apparent
that the latter question is an important one, upon which the
parties are at issue, and which very likely will have to come
up again for decision after proper demand shall have been
made.  It is therefore deemed advisable, since the subject
has been fully argued and considered, to express our decision
upon it.

The question so presented is whether the interlocking sys-
tem or machine was intended to be included within the ex-
pression "other similar appliances," for clearly it is not in-
cluded in the specific things described as "watch houses,"
"signal stations," or "signals."  Each of these may perhaps
be included in the interlocking plant, but neither of them
alone, nor all of them together, include the important and
characteristic element of the latter.  That element is a pe-
culiarity of construction of the tracks of each railroad some
500 feet away from the crossing, connected with each other
through the medium of a machine, so as to create absolute
physical obstacles to the passage of a train to collision at the
crossing.  This is no signal, for that implies merely a notifi-
cation to the trainmen, by reason of which they are to govern
their conduct.  The very purpose of the interlocking ar-
rangement is to render signals wholly unimportant and im-
material to the purpose of preventing collision.  True,
signals are used in connection with the interlocker, but not
to safeguard the crossing,—merely to enable the trainmen
to avoid the derailing of their own trains.

Turning then to a consideration of the force and meaning
of the expression "other similar appliances," we enter a field
for construction and interpretation, for the words are not
definite and certain.  They may apply to one thing or an-

other, as it may appear to be similar or dissimilar from evidence *dehors* the writing. We also enter a field where the court must be aided by parol evidence, for several reasons: First. Because the contract relates to a particular trade or calling, having a terminology of its own. *Houghton v. Watertown F. Ins. Co.* 131 Mass. 300, 303; *Walls v. Bailey,* 49 N. Y. 464; Jones, Cont. §§ 60, 62. Second. Because ambiguity is shown by parol evidence to exist, and needs such evidence to clear it up. *Vilas v. Bundy,* 106 Wis. 168. Third. Because the situation and circumstances surrounding the contracting need to be ascertained. *Wussow v. Hase,* 108 Wis. 382; *Brittingham & H. L. Co. v. Manson,* 108 Wis. 221, 225. Fourth. Because the words of the contract must be applied to facts ascertainable only by extrinsic evidence. *Vilas v. Bundy, supra; Wussow v. Hase, supra.* Upon these several subjects the court became a trior of facts, and his decisions thereon are binding and conclusive upon this appeal, unless so in defiance of the clear preponderance of the evidence as to warrant the inference of mistake, oversight, or prejudice. *Vilas v. Bundy, supra; Wussow v. Hase, supra; Wyss v. Grunert,* 108 Wis. 38; *Hill v. American S. Co.* 112 Wis. 627. The court has found as a fact that the words used in the contract do not, and at the time of the contract did not, include an interlocking plant, and were not so intended or understood. In support of this finding there is evidence that the interlocking plant was known to railroad men for many years before 1884; that it differed from all ordinary signal devices in the respect above stated, namely, that its purpose and effect were not so much warning not to approach the crossing when dangerous, as actual physical prevention of the approach; that it was vastly more expensive than any system of signal appliances; that whenever railroad-crossing contracts have been intended to require an interlocking system, to the knowledge of the witnesses, they have described it specifically, and not stopped with such expres-

sions as are used in this contract; that none of the expres-
sions used in the contract ("flagmen," "switchmen," "watch-
men," "watch houses," "signal stations," or "signals") would
be understood or used by railroad men as referring to or
suggesting an interlocking plant; that until very recent years
railroads have not deemed the expense of an interlocking
system warranted, except at very important crossings; in-
deed, that only two or three had been put in use west of the
Alleghanies.   There is, too, much evidence that the general
use of such plants is due to conditions developed recently
and long since the making of the contract, by reason of the
greatly increased weight and speed of trains, whereby has
been greatly increased the expense of their stoppage, as also
the loss to the business resulting from interruption of rapid-
ity of transit; also because of prosperous conditions of rail-
roads, whereby such expensive appliances are brought within
their means.   True, on some of these subjects there is con-
flict of evidence, but not such as to destroy conclusiveness
of the trial court's decision.

Great space is devoted by appellant's counsel to refutation
of the idea that the great and direct purpose of installing
interlockers is to avoid necessity of stopping trains at
crossings, to which several witnesses testify.   He urges upon
us the testimony of other witnesses that the purpose, like
that of signals, gates, or flagmen, is to safeguard the cross-
ings.   After a careful reading of the record, we are satisfied
that, while the ultimate object is safety, these devices are
not in fact used at crossings, except where stoppage of trains
is a serious burden and expense.   Of course, in the operation
of railroads there is continual balancing of the expense of
safeguards, on the one hand, against the degree of peril and
expense of doing without them, on the other.   Doubtless the
surest guaranty at crossings is to substitute an overhead via-
duct for one of the roads, but that is not adopted till peculiar
circumstances of frequency of trains, difficulty of observation,

etc., make the probable expense, inclusive of damage from accidents, outweigh the expense of making and operating the nongrade crossing. Doubtless the ultimate purpose of such a change would be safety, but that consideration alone would not induce it. Clearly, such a change of construction would not be an appliance similar to signals, merely because safety is the ultimate object. That escape from necessity of stoppage is a very important, if not the dominant, immediate object of an interlocking plant, is indicated by many things outside the testimony. Thus the complaint, while inferentially conceding that the purpose of safety had been sufficiently accomplished for fifteen or sixteen years, asserts that within a few years past the difficulty and expense of stopping trains have greatly increased, because of greater weight and speed, and that it would be a great inconvenience and hardship to require such stoppage. The response of defendant's general manager to the demand for such appliance indicates his view of its purpose, expressed before litigation. He says: "We have *no use* for it, as our trains are few and their time is slow." Again, statutes of various states make the stoppage of trains dependent on existence of interlocking plants, indicating legislative view that, for safety alone, stoppage of trains is the equivalent of the interlocker. This view is emphasized by one of the most intelligent and experienced of the witnesses, who, speaking of the semaphore signal, says:

"I regard it as a perfectly safe method of guarding a crossing, if you want to undertake the plan of stopping all trains."

Several other witnesses testify to the dominance of the purpose of escaping the stoppage of trains, while still others assert pre-eminence to the motive of safeguarding the crossing. In view of the whole record, we should not doubt that there was evidence to support the view that the main purpose of installing an interlocking plant at a crossing is ordinarily

to avoid stopping trains, consistently with safety. We do not, however, consider that a very important question. Devices are not necessarily similar merely because their ultimate purpose is. A conductor's registering bell punch would hardly be similar to a station wicket and keeper, although the purpose of both be the same. Nevertheless the fact that in the operation of railroads the expense of interlockers at crossings has seldom been incurred, except to avoid the alternate precaution of stopping trains, is significant upon the probable understanding of the parties, for at the time of contract no such result could have been accomplished by installing the appliance. The statute as it then existed required stoppage in any event. Sec. 1808, R. S. 1878.   Some light is thrown by authority upon the reasonableness, and therefore the probability, of appellant's construction of this contract. In *Arkansas & O. R. Co. v. St. L. & S. F. R. Co.* 103 Fed. Rep. 747, the United States circuit court for the Western district of Arkansas held that demand for an interlocking plant as condition of crossing was wholly unreasonable. In *Detroit, Ft. W. & B. I. R. Co. v. Commissioners of Railroads* (Mich.), 86 N. W. Rep. 842, the supreme court of Michigan held that the expense of safety devices to facilitate convenience of operation could not be imposed exclusively upon the junior road. See, also, 3 Elliott, R. R. §§ 1126–1129, as to permissible impositions upon railroads seeking to cross others.

One argument much urged by appellant is to the effect that respondent has not been able to suggest any appliance other than the signals in use at the time of making the contract, and therefore included by the word "signals," which is ever used to safeguard crossings, except the interlocking, and that the words "other similar appliances" must either apply to such plant or be meaningless. The premise is hardly correct, for there is evidence that gates swinging across the tracks may be, and frequently are, used. While such appliance serves as a signal, it would not be very aptly

described by that word, and might be by the subsequent phrase. Apart from this, however, many appliances for giving warning to train crews may be conceived other than the flagman, the ball signal, the semaphore, and the gate, which were the only ones in use when the contract was made. Electrical connection between the tracks of the crossing roads, whereby the passage of a train on one toward the crossing is by light or bell notified to the other, may be suggested. The now much-exploited wireless telegraphy may offer another method. In both such cases the warning may be said to be given by signal, but not by means of anything designated by that name at the date of the contract. Appliances for such new methods would be similar to the old, at least in purpose to warn the trainmen. An entirely reasonable and probable intent attributable to the general clause under discussion is that of providing for the case of subsequent discovery or invention, and we do not think it can be said to be meaningless because nothing to which it can apply has yet been generally adopted by railroads.

In the light of all the evidence and of the words of the contract, we are unable to say that it so clearly appears that the interlocking plant is an appliance similar to those specifically mentioned in the contract, or that the purpose of the parties at the time of contracting was such as to necessarily include it, that we can repudiate the finding of the trial court thereon. We therefore agree with that court in the conclusion that the contract under consideration does not, under any circumstances, require defendant, at its expense, to install and maintain an interlocking plant.

Appellant further urges that, although we so hold, still under the prayer of the complaint should be decreed what duty does rest on defendant, and that such duty be specifically enforced. The trouble with that contention is that defendant has not agreed to do anything until required, and paintiff has not required any other appliance than that al-

ready discussed.   The court cannot properly make a cata-
logue of the various duties which plaintiff has the option to
impose on defendant in advance of the exercise of such op-
tion.   When requirement is made for performance of a duty
within the contract, the defendant may comply, and no aid
from a court be needed.   We find no reason to change our
former judgment of affirmance, and none to make necessary
or desirable a rehearing of the appeal.

*By the Court.*—The motion for rehearing is denied, with-
out costs.

MARSHALL, J., dissents.