# CASES DETERMINED

# August Term, 1906.

---

ABROHAMS, Appellant, vs. REVILLON FRERES, Respondents.

*April 30—October 9, 1906.*

*Contracts: Offer and acceptance: Authority of agent.*

1. Defendants' buyer of raw furs gave plaintiff, a local dealer in pelts, etc., a written memorandum, dated at Green Bay, January 16, stating that he would "take up, at his selection, goods from [the plaintiff], only this section goods, at the following prices up to sales in January or on or about February 1." Prices for skins were specified, and the writing was signed by the buyer for the defendants. The term "selection," as used in the fur trade in that locality, in connection with a sale of an entire lot of furs to be gathered from a stated section, was found by the jury to mean "the right only to determine what furs are from such section." On January 29 plaintiff wrote to defendants that he had got the goods completed and that defendants should come and get them. *Held*, that the memorandum was a continuing offer to take from the plaintiff, at the prices therein named, such goods as were therein described which he might acquire from that section within the period mentioned, and that plaintiff's letter was an acceptance of such offer, which thereupon ripened into a contract.

2. The evidence (stated in the opinion) is *held* sufficient to sustain a finding of the jury that plaintiff was justified in believing that defendants had given the buyer authority to contract for them for furs to be gathered and delivered in the future, and a further finding that the buyer had in fact such authority.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Reversed.*

The complaint alleges, in effect, that at the times mentioned

therein the plaintiff was a dealer in hides, pelts, furs, and
wool at Green Bay; that the defendants, whose individual
names are unknown to the plaintiff, were, during said times,
copartners engaged as manufacturing furriers and wholesale
fur dealers in Chicago, New York, and Europe; that January
16, 1904, at Green Bay, the plaintiff and the defendants en-
tered into a contract whereby the defendants agreed to take
all of the plaintiff's purchase of furs up to February 1, 1904,
at the agreed price of $2.50 for minks, $1 for skunks, $1.50
for raccoons, twenty-five cents for rats,—red fox and other
goods; that between January 16, 1904, and February 1, 1904,
the plaintiff purchased, secured, and had, of such furs, 752
mink, 900 skunk, 324 raccoon, 5,621 muskrats, and 42 red
fox, for the purpose of filling the said contract; that during
said time and on or about February 1, 1904, the plaintiff no-
tified the defendants that he had on hand said furs to fill said
contract, and tendered the same to the defendants, and re-
quested them to take the same and pay therefor according to
said contract; that the plaintiff was ready and willing at all
times to keep and perform said contract on his part, but the
defendants wholly and wrongfully refused to take said furs
or any of them, or to pay for the same, to the plaintiff's dam-
age in the sum of $1,065.32, by reason of being forced to sell
the same at great loss, the market therefor having declined,
the amount stated being the sum realized less than the de-
fendants had contracted to pay therefor, for which amount the
plaintiff demands judgment, with costs.    The defendants an-
swered by way of admissions that the plaintiff was engaged in
business as alleged, and that the defendants were copartners
engaged in business as alleged, but otherwise denied each and
every allegation of the complaint.

At the close of the trial the jury returned a special verdict
as follows:

"(1) Is the term 'selection' used, in the fur trade, in this
locality, in connection with a sale of an entire lot of furs to

be gathered from a stated section, as designating the right only to determine what furs are from such section? *A.* Yes. (2) Was the plaintiff justified in believing that the defendants had given Mr. Ball authority to contract for them for furs to be gathered and delivered in the future? *A.* Yes. [Changed by the court to 'No.'] (3) Had Mr. Ball authority to contract for the defendants for furs to be gathered and delivered in the future? *A.* Yes. [Changed by the court to 'No.'] (4) What quantity of furs of the kinds mentioned in Exhibit 1 did the plaintiff have on hand for delivery to the defendants. on or about February 1, 1904? *A.* 752 mink, less 2 per cent. trash, 737. 900 skunk, less 4 per cent. trash, 864. 324 raccoon, less 3 per cent. trash, 315. 5,621 rats, less no per cent. trash, 5,621. (5) What was the market price of said furs on or about February 1, 1904? *A.* The mink, $2.05; total, $1,510.85. The skunk, 81 cents; total, $699.84. The raccoon, $1.04; total, $327.60. The rats, 18 cents; total, $1,011.78."

After the return of such verdict the plaintiff moved for judgment thereon against the defendants for $1,041.13 damages and for the costs and disbursements of the action, which motion was denied by the court. The defendants moved to strike out the answers of the jury to the first, fourth, and fifth questions of the special verdict as immaterial, and change the answers of the jury to the second and third questions from the affirmative to the negative, and, upon the verdict so amended and the uncontradicted evidence, for judgment dismissing the complaint, with costs, and that, in case such motion should not be granted, then to set aside the verdict and for a new trial. Thereupon the court ordered that the answers of the jury to the second and third questions submitted should be changed from the affirmative to the negative, and the court further ordered that, upon the said special verdict. as amended, and upon the undisputed evidence and the whole record in said case, said defendants have judgment against the said plaintiff dismissing the complaint, and for their costs and disbursements in the action. From the judgment so en-

tered in accordance with such order of the court herein the plaintiff appeals.

The contract or agreement referred to in the complaint and in the fourth question of the special verdict as Exhibit 1 is as follows:

"*B. Abrohams,* Dealer in Hides, Pelts, Furs, Wool, Tallow, Rags, Rubbers, Metal, and Scrap Iron.

"Green Bay, Wis., Jan. 16, 1904.

"W. E. Ball will take up, at his selection, goods from the above concern, only this section goods, at the following prices up to sales in January or on or about Feb. 1st, 1904:

| | | | |
|---|---|---|---|
| Mink, | no trash | ........................................ | $2 50 |
| Skunks, | " " | ........................................ | 1 00 |
| Raccoon, | " " | ........................................ | 1 50 |
| Rats, | " " | ........................................ | 25 |

Red fox, and other goods, as to values.

"W. E. BALL, for *Revillon Freres.*"

For the appellant there was a brief by *Wigman, Martin & Martin,* and oral argument by *P. H. Martin.* They argued, among other things, that no element of a contract is lacking. What was uncertain as to quantity must necessarily become certain at the end of the collection of furs by plaintiff, or as measured by the usual course of the business. *Shadbolt & B. I. Co. v. Topliff,* 85 Wis. 513; *McCall Co. v. Icks,* 107 Wis. 232; *Excelsior W. Co. v. Messinger,* 116 Wis. 549; *W. G. Taylor Co. v. Bannerman,* 120 Wis. 189; *Eastern R. Co. v. Tuteur,* 127 Wis. 382, 105 N. W. 1067; *Wells v. Alexandre,* 130 N. Y. 642, 29 N. E. 142; *Minn. L. Co. v. Whitebreast C. Co.* 160 Ill. 85, 43 N. E. 774; *Hickey v. O'Brien,* 123 Mich. 611, 82 N. W. 241; *Nat. F. Co. v. Keystone Mfg. Co.* 110 Ill. 427.

For the respondents there was a brief by *Sheridan & Evans,* and oral argument by *W. L. Evans.* They contended, *inter alia,* that the alleged contract, even if accepted by the plaintiff, is a mere *nudum pactum* and is void for uncertainty, entire want of consideration, and lack of mutuality. Mr. Ball did not agree to take any definite amount of goods. A desig-

nation of the article sold must be sufficiently contained in the memorandum, which cannot be added to or varied by parol evidence.   *Russell v. Wis., M. & P. R. Co.* 39 Minn. 145, 39 N. W. 302; Benj. Sales (7th Am. ed.) 225; 23 Cent. Dig. col. 2274; Browne, Stat. Frauds, § 385; *Stewart v. Cook,* 118 Ga. 541, 45 S. E. 398; 29 Am. & Eng. Ency. of Law (2d ed.) 874.   See, also, *Wells v. M. & St. P. R. Co.* 30 Wis. 605; *Beers v. North M. T. S. Co.* 93 Wis. 569; *Irish v. Dean,* 39 Wis. 562; *Hoffman v. Maffioli,* 104 Wis. 630, 47 L. R. A. 427; *Moulton v. Kershaw,* 59 Wis. 316; *Chicago & G. E. R. Co. v. Dane,* 43 N. Y. 240; *Teipel v. Meyer,* 106 Wis. 41; *Swanson v. Andrus,* 83 Minn. 505, 86 N. W. 465.

The following opinion was filed May 8, 1906:

CASSODAY, C. J.   The important question is whether the trial court was justified in changing the answers of the jury to the second and third questions from the affirmative to the negative.   By such ruling the court in effect held, notwithstanding the evidence and findings of the jury to the contrary, that the plaintiff was not "justified in believing that the defendants had given Mr. Ball authority to contract for them for furs to be gathered and delivered in the future," and that Mr. Ball had no "authority to contract for the defendants for furs to be gathered and delivered in the future."   This makes it necessary to consider some of the evidence in the case.

Mr. Ball was the first witness called by the plaintiff, and he testified to the effect that he lived in New York; that he knew the defendants; that they do business in Chicago, New York, Montreal, Paris, London, and other foreign places, and had for a great many years; that he was a salesman and buyer of raw furs for the defendants; that he only traveled through Wisconsin, Minnesota, and Dakota on the raw furs; that he traveled all over the country on selling goods.   Exhibit 1, referred to in the complaint and the special verdict and set

forth in the foregoing statement, being shown to the witness, he testified: "This is my signature. The entire body of the instrument is in my handwriting."

Mr. Ball was subsequently called as a witness and examined by the defendants, and, among other things, testified to the effect that his business was salesman and buyer of raw furs for the defendants; that he had been engaged in that business for thirty-two years; that during about fifteen years of that time he had made purchases of furs in the vicinity of Green Bay; that he was acquainted with the plaintiff and had known him for four or five seasons; that he had done business with him during that period of time; that he purchased furs from him during that time; that he never before entered into any written contract with the plaintiff; that he had on several occasions purchased furs from the plaintiff; that during his acquaintance with the plaintiff he had bought at least one-half dozen lots from him, and perhaps more; that he never told the plaintiff that he was not authorized to make a purchase for future delivery; that January 16, 1904, he purchased a lot of furs from the plaintiff; that the plaintiff then requested him to leave a price list—what the house would pay for delivery February 1, 1904, or the January sales,—and so, at the request of the plaintiff, he wrote the alleged contract; that his usual method of buying is not to look at the goods until the seller gets his figures on the quantities, and then he goes to the lots and sorts them; that if the goods were not up to the class of goods wanted for the New York concern for which he purchased, then he would offer a price so low that it would not be accepted by the seller, but if the goods came up to his opinion of them, then he would buy them. He was further allowed to testify, against objection, that he had no authority to make contracts for the purchase of skins without advising the house; that he had no authority to sign contracts for any goods to be purchased in advance without advising the house; that he had no express authority to contract orally

or in writing for future delivery; that he believed he signed
one contract for the defendants with Frank Pursey of Osh-
kosh, by telegram and communication from the house; that in
other instances the contract had been sent on to the house
and kept up and delivered; that he could not call to memory
the percentage of trash in the amount he bought of the plaint-
iff January 16, 1904, without having his assortment; that in
every purchase he knew the exact percentage, and that his as-
sortments would stand against the assortment by the grade-
men of the house of the defendants.

There is evidence on the part of the plaintiff tending to
prove that he never requested Ball to give him a price list
at the time of making Exhibit 1; that at that time Ball told
him that he wanted to contract for the plaintiff's goods; that
Ball wrote the contract himself and said that he had made
contracts for future delivery with other persons, including
Pursey of Oshkosh; and that Ball never at any time told the
plaintiff that he had no authority to purchase for future de-
livery.

The alleged contract, Exhibit 1, so admitted to have been
written by Mr. Ball and signed by him, "W. E. Ball, for
*Revillon Freres,*" speaks for itself. If it was intended by
him to be a mere price list, furnished at the request of the
plaintiff, he hardly would have signed it for and in the name
of the defendants. Speaking for the defendants, he said, in
effect, that he would take up goods from the plaintiff, ex-
clusive of trash, at the prices therein named up to February
1, 1904. The promise to take up the goods, exclusive of
trash, during the limited period mentioned, constituted no
part of a mere price list. True, the offer was limited to
"only this section goods" and "at his selection." But "the
term 'selection' used in the fur trade," as mentioned in the
question submitted, was found by the jury to be "the right
only to determine what furs are from such section." The
trial court refused to set aside that finding of the jury, and

hence the same must be regarded as a verity.    True, the writing did not constitute a bill of sale of any goods, nor, of itself, did it constitute a binding contract between the parties.    But it was, manifestly, a continuing offer to take from the plaintiff such goods as were therein described, at the prices therein named, and which he might acquire from that section during the fifteen days therein mentioned.

Did the plaintiff accept such offer?    It is admitted that January 29, 1904, the plaintiff wrote to the defendants to the effect that he had got the goods completed and that the defendants should come and get them.    On the next day the defendants—"*Revillon Freres,* per W. E. Ball"—answered that letter as follows:

"Chicago, Jan. 30, 1904.

"*Mr. B. Abrohams,* Green Bay, Wis.

"Dear Sir: Yours of the 29th inst. at hand.    In reply will say the writer will be in your section some day the coming week.    The markets at London show a big decline; skunk 20 per cent.; mink 10 per cent.; rats 15 per cent.; red fox 10 per cent.; coon 25 per cent.; gray fox 35 per cent.    Look for further decline in March.

"Yours respectfully."

February 10, 1904, the plaintiff telegraphed the defendants at Chicago: "Why don't you come?    We are waiting. Wire at once."    On the same day the defendants wrote the plaintiff: "We have duly received the telegram sent Mr. Ball, and forwarded it at once to him.    Mr. Ball being out of town just now, we cannot tell when he may be able to call on you. Yours truly, *Revillon Freres,* per V. G."    On the next day the defendants telegraphed the plaintiff: "Have forwarded yours.    Ball out of town.    Will not be able to call this week." Notwithstanding the decline in the London market for such goods, as mentioned in the letter of the defendants of January 30, 1904, in answer to the plaintiff's letter of the day before notifying them that he had completed the accumulation of goods and requesting them to come and get them, yet the de-

*fendants did not decline to take the goods, as promised in the offer, until their letter of February 11, 1904, dictated by Mr. Ball, which refusal is therein stated to be "on account of the large decline in raw furs." That letter was not received by the plaintiff until February 13, 1904, when the plaintiff at once notified the defendants by telegram to come at once and take the goods at the prices named in their contract, and on the same day wrote the defendants at length to the effect that, if they did not come and take the goods as agreed in the contract, he would "be compelled to find an immediate sale for the furs, and to hold" the defendants "for damages for the differences between" their "contract price with" the plaintiff and what he might "receive in the market."

The evidence thus summarized is taken principally from the testimony of Mr. Ball and the correspondence between the parties. There is other testimony tending to support the plaintiff's contention. We are constrained to hold that the evidence is sufficient to sustain the finding of the jury, not only that the plaintiff was justified in believing that the defendants had given Mr. Ball authority to contract for them for furs to be gathered and delivered in the future, but also sufficient to sustain the finding that Mr. Ball had such authority. It also appears from the undisputed evidence that within the fifteen days mentioned in the offer of the defendants the plaintiff accepted the same, and notified the defendants that he had completed the collection of such goods and that they should come and get them. By the answers to the fourth and fifth questions submitted, the jury found the quantity of furs of the kind mentioned in Exhibit 1 that the plaintiff had on hand for delivery to the defendants on or about February 1, 1904, and also the market price of said furs at that date. The trial court declined to strike out such answers, and hence such findings must be regarded as verities in the case. We are constrained to hold that the plaintiff's acceptance of such offer constituted a binding contract be-

tween the parties. Thus it was said many years ago by the supreme judicial court of Massachusetts:

"Though the writing signed by the defendant was but an offer, and an offer which might be revoked, yet, while it remained in force and unrevoked, it was a continuing offer during the time limited for acceptance, and during the whole of that time it was an offer, every instant; but as soon as it was accepted, it ceased to be an offer merely, and then ripened into a contract." *Boston & M. R. v. Bartlett,* 3 Cush. 224, 227.

That language has received the express sanction of this court. *Sherley v. Peehl,* 84 Wis. 46, 52, 54 N. W. 267. See, also, *Hoffman v. Maffioli,* 104 Wis. 630, 80 N. W. 1032; *Brittingham & H. L. Co. v. Manson,* 108 Wis. 221, 84 N. W. 183; *Excelsior W. Co. v. Messinger,* 116 Wis. 549, 555, 556, 93 N. W. 459. So, as to the authority of Mr. Ball to make the written offer of January 16, 1904, this court has declared:

"It is well understood that every delegation of power carries with it the authority to do all those things which are reasonably necessary and proper to carry into effect the main powers conferred, and which are not forbidden, and that secret instructions cannot affect such apparent powers to the detriment of third persons who have dealt with the agent on the basis of his apparent authority." *Parr v. Northern E. Mfg. Co.* 117 Wis. 278, 287, 93 N. W. 1099, 1102.

Such is said to be "a fundamental principle in the law of agency." Mechem, Agency, § 280.

It follows from what has been said that the motion of the plaintiff for judgment in his favor upon the pleadings, evidence, and special verdict should have been granted.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded with direction to enter judgment in favor of the plaintiff and against the defendants. as indicated in this opinion

A motion for a rehearing was denied October 9, 1906.