STATE EX REL. NORTHERN PACIFIC RAILWAY COMPANY, Appellant, vs. RAILROAD COMMISSION OF WISCONSIN and others, Respondents.

*March 31—October 5, 1909.*

*Railroads: Powers of Railroad Commission: Statutes construed: Crossing of tracks: Fixing place: Safety devices: Apportionment of expense: Condemnation proceedings: Compensation to senior road, what to include: Constitutional law: Power to amend charters: Vested property rights: Police power: Delegation of legislative power: Judicial power: Review of orders of Railroad Commission.*

1. Ch. 454, Laws of 1907, and particularly sec. 1797—56, Stats., vests in the Railroad Commission power to determine the point at which, as well as the manner in which, the track of one railroad shall be crossed by that of another; and the question of compensation only is left to the commissioners appointed by the court under subd. 6, sec. 1828, Stats. (1898).

2. The law as it before existed respecting the right of a railroad company to designate its route was not abrogated by ch. 454, Laws of 1907.

3. The power of the state to alter or repeal existing charters of corporations cannot be used to take away property or rights which have become vested under a legitimate exercise of the powers granted by a charter.

4. A railway company which constructed its road while a statute (subd. 6, sec. 1828, Stats. 1898) was in force under which, as at common law, it could not be required to pay any part of the expense of making and maintaining any subsequent crossing of its track by the track of another railway, acquired thereby

a vested property right which cannot be taken for the benefit of another company without compensation, in the exercise of the reserved right to alter or amend charters.

5. To compel the senior railway company to pay any part of the expense occasioned by the crossing of its road by the junior company would be a taking of the property of the former; and such a taking without compensation to the senior company would not be a reasonable or valid exercise of the police power.

6. Sec. 1797—56, Stats. (Laws of 1907, ch. 454),—relating to crossings of railway tracks thereafter made, and providing that the Railroad Commission may prescribe the protective appliances to be maintained at such crossings and fix the proportion of the expense of constructing, operating, and maintaining such a crossing and protective appliances which shall be paid by the owners of said tracks respectively,—may reasonably be so construed as not to require the Commission to impose any part of the expense of the crossing upon the senior road which would result in a taking of its property without compensation; and in support of the validity of the statute it should be so construed.

7. When, pursuant to sec. 1797—56, the Railroad Commission imposes upon the senior road a part of the expense of constructing, operating, and maintaining a crossing of its tracks and the prescribed protective appliances, the senior road is entitled to recover in the condemnation proceedings before commissioners appointed by the court (under subd. 6, sec. 1828, Stats. 1898) all damages suffered by it by reason of the crossing, including damages on account of the burden or expense so imposed upon it by the Commission.

8. This provision of sec. 1797—56, that the Railroad Commission may apportion the expense of the crossing, is not a delegation of legislative power, or a vesting of judicial power in the Commission.

9. An order of the Railroad Commission will not be disturbed by the courts unless it is unlawful or unreasonable.

10. An order of the Railroad Commission apportioning the expense of a crossing, pursuant to sec. 1797—56, should leave the amount of damages occasioned by the crossing to be fixed by the commissioners appointed by the court in the condemnation proceedings under subd. 6, sec. 1828, Stats. (1898).

*Per* Marshall, J., *concurring:*

1. The right, in a general sense, to construct a railroad is referable to the certificate of public convenience and necessity, under secs. 1797—43 to 1797—53, Stats. (Laws of 1907, ch. 454).

State ex rel. Northern Pac. R. Co. v. Railroad Commission, 140 Wis. 145.

2. The right to cross the tracks of a senior railroad is referable to subd. 6, sec. 1828, Stats. (1898).

3. The right to take the property of the senior road at the point of crossing is referable to said subd. 6, sec. 1828.

4. Authority to locate the place of crossing is referable to the implied power of the Railroad Commission under secs. 1797—54 to 1797—56, and the general spirit of the act of 1907, superseding by necessary inference subd. 6, sec. 1828, Stats. (1898), on that subject.

5. The manner of constructing the railroad, including the manner of making the crossing with its accessories, and the establishing of status in respect thereto to be dealt with in condemnation proceedings, is referable to the decision of the Railroad Commission under secs. 1797—54 to 1797—56.

6. The manner of acquiring property for the purposes of the road, including that of any other road at the crossing, is referable to secs. 1845–1851, and such other parts of ch. 87, Stats. (1898), as bear on the subject, the proceedings to that end to be subsequent to the determination by the Railroad Commission under secs. 1797—54 to 1797—56.

7. The commissioners in condemnation proceedings are required to deal with the situation created by the determination aforesaid making the owner of the senior road good by an award of a money equivalent for *such* appropriation of its property rights as shall be contemplated in view of such determination, including the cost of *such* grading, rails, frogs, switches, and other appliances used in constructing and maintaining the crossing, and maintaining and operating safety appliances, as shall be preliminarily entailed upon it in view of *such* determination.

BARNES, J., and WINSLOW, C. J., *dissenting*, are of the opinion:

1. So much of sec. 1797—56, Stats., as empowers the Railroad Commission to require the senior company to bear any portion of the expense of constructing a crossing proper is void because it deprives the company of its property without due process of law; but the invalidity of this particular provision does not affect the remaining portion of the act.

2. An order of the Commission, not imposing upon the senior company any part of the expense of constructing the crossing proper, but requiring it to defray one half of the expense of maintenance, is not erroneous in the absence of anything to show that such latter expense was a material item or that the half thereof would exceed the cost of maintaining the road at that point had no crossing been made.

3. Whether a crossing already exists or is to be made, the state, in the exercise of its police power, may require that it be safeguarded by protective appliances, such as interlocking plants, whenever in the exercise of reasonable judgment such devices are deemed to be required for the public safety or convenience, and may make any reasonable apportionment of the expense between the roads affected, without reimbursement to the senior company.

4. The legislative declaration requiring railway companies to install approved safety devices whenever necessary to protect life or facilitate commerce is implied in the language of ch. 454, Laws of 1907, and in view thereof the delegation of power to the Railroad Commission to determine the fact as to the necessity for such devices at a given point, and to apportion the expense thereof, is valid.

5. Sec. 1797—56, Stats., should not be construed as giving the senior company any right to recover from the junior, in condemnation proceedings or otherwise, the amount apportioned to and paid by such senior company for the construction or maintenance of safety devices at a crossing.

6. There is no limitation on the right of the legislature, under sec. 1, art. XI, Const., to repeal corporate charters, except the consciences of the legislators, and no limitation on the right of amendment, except the XIVth amendment to the federal constitution.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Modified and affirmed.*

This is a *certiorari* proceeding brought by the relator, *Northern Pacific Railway Company,* to set aside and declare invalid an order made by the *Railroad Commission of Wisconsin.* The matter was heard in the circuit court for Dane county upon a petition, writ of *certiorari,* and return thereto, and judgment was entered by the court below affirming the order of the *Railroad Commission,* from which judgment this appeal was taken.

It appears from the record before us that more than twenty years ago the Northern Pacific Railroad Company, the predecessor of the *Northern Pacific Railway Company,* relator herein, acquired for its main line from Ashland, Wis-

consin, to Duluth, Minnesota, and from Ashland to the Pacific coast, a right of way across the northwest quarter of section 2, township 42 north, of range 14 west, and also a right of way for a spur on Connor's Point, both in the city of Superior, Wisconsin. Tracks were constructed on these rights of way and have ever since been maintained as a part of the system of railways owned by relator and its predecessor. When these rights of way were acquired and the tracks constructed, subd. 6, sec. 1828, R. S. 1878, defining the powers of railroad corporations and relating to the crossing of tracks of railroads, provided:

"To cross, intersect, join and unite its railroad with any railroad heretofore or hereafter constructed, at any point on its route and upon the grounds of such railroad corporation, with the necessary turnouts, sidings and switches and other conveniences in furtherance of the objects of its connections. And every corporation whose railroad is or shall be hereafter intersected by any new railroad shall unite with the owners of such new railroad in forming such intersections and connections and grant the facilities aforesaid; and if the two corporations cannot agree upon the amount of compensation to be made therefor or the points and manner of such crossings and connections the same shall be ascertained by commissioners to be appointed by the court, as is provided in this chapter in respect to acquiring title to real estate. But no corporation which shall have obtained the right of way and constructed its road at the point of intersection before the application for the appointment of commissioners may be made shall be required to alter the grade or change the location of its road, or be required to bear any part of the expense of making and maintaining such crossing or of such proceeding."

In 1907 the legislature of Wisconsin passed ch. 454, Laws of 1907, which contained the following provision:

"Sec. 1797—56. Every crossing of the track of a steam railroad hereafter made by the track of another steam railroad; and every crossing of the track of an electric or street railway surface road hereafter made at points outside the

limits of incorporated cities by the tracks of a steam railroad; and every crossing of the track of a steam railroad or of any other electric or street railway surface road hereafter made at points outside the limits of incorporated cities by the track of an electric or street railway surface road shall be above, below or at grade of the tracks proposed to be crossed as the *Railroad Commission* shall determine after hearing the parties upon reasonable notice prescribed by said *Commission.* In such determination, said *Railroad Commission* shall prescribe the kind and character of the protective appliances, if any, to be installed, operated and maintained at such crossings, and they shall also fix the proportion of the expense of originally constructing, operating and maintaining such crossing and of any protective appliances prescribed by them and the proportion of the expense of operating and maintaining the same which shall be paid by the owners of said tracks respectively.   In case said commissioners shall not in the first instance require protective appliances to be installed at grade crossings made under this section, they shall after reasonable notice to and hearing of the parties, have power on application of either party interested in maintaining and operating said crossing, or on their own motion to require protective appliances to be installed, operated and maintained at such grade crossings and to fix the basis upon which the parties using such crossings shall bear and pay the cost and expense of constructing, operating and maintaining the same."

After the passage of the foregoing act the *Wisconsin & Northern Minnesota Railway Company* was organized under the laws of Wisconsin, and obtained from the *Railroad Commission of Wisconsin* a certificate of convenience and necessity for the construction of a line from the city of Superior across the double tracks of the relator known as the Newton Avenue line and across the track of the relator located on Connor's Point.   Thereafter it filed its plans and specifications for the construction of its proposed railroad, showing grade crossings of the relator's tracks.   A hearing was had before the *Railroad Commission,* and the *Commis-*

*sion* on May 26, 1908, made an order whereby it was deter-
mined and directed that the crossings be at grade; that the
expense of constructing the crossings be paid by the *Wiscon-
sin & Northern Minnesota Railway Company;* that after the
construction of the crossings each company bear one half of
the expense of maintaining and operating them; that an in-
terlocking, derailing, and signal system be put in at the cross-
ing of the double tracks; and that each company bear one
half of the expense of constructing, maintaining, and operat-
ing such system.   The relator opposed a grade crossing.

The evidence shows that, before the passage of ch. 454,
Laws of 1907, in grade crossings it was customary for the
junior road to pay the entire cost of constructing, operating,
and maintaining the crossing and interlocking system.   The
position of the appellant here is that the order of the *Railroad
Commission,* affirmed by the court below, charging it with any
part of the expense of maintaining the crossing, or any part
of the expense of the construction or maintenance of the in-
terlocking, derailing, and signal system, is without author-
ity of law and void, and that if ch. 454, Laws of 1907, be
construed as authorizing the order of the *Commission,* it de-
prives the relator of its property without due process of law,
contrary to the provisions of sec. 1 of the XIVth amend-
ment to the constitution of the United States, and of sec. 13
of article I of the constitution of Wisconsin, and that if said
chapter be constitutional and applies to the crossing of rail-
roads constructed prior to its enactment, then there is no evi-
dence to support the order of the *Railroad Commission* so
far as that order directs the relator to bear any part of the
cost of operating or maintaining the crossings or the con-
struction or maintenance of the interlocking system; that the
applicant, *Wisconsin & Northern Minnesota Railway Com-
pany,* never obtained any authority to enter upon or cross
the tracks or rights of way of the relator.

Three cases are brought before us here by *certiorari* and

argued together, namely, the instant case, *State ex rel. Great Northern Railway Company v. Railroad Commission, post,* p. 181, 121 N. W. 932, and *State ex rel. Lake Superior Terminal & Transfer Railway Company v. Railroad Commission, post,* p. 182, 121 N. W. 932. The contentions in each of these cases are substantially the same. The decision, therefore, in this case will be decisive of the other two.

For the appellant there was a brief by *Louis Hanitch,* attorney, and *Charles W. Bunn* and *Charles Donnelly,* of counsel, and oral argument by *Mr. Hanitch* and *Mr. Donnelly.*

For the respondents there was a brief by the *Attorney General* for the *Railroad Commission,* by *Luse, Powell & Luse,* attorneys for the Minneapolis, St. Paul & Sault Ste. Marie Railway Company and the *Wisconsin & Northern Minnesota Railway Company,* and by *Alfred H. Bright,* of counsel; and the cause was argued orally by *Mr. L. K. Luse* and *Mr. Bright.*

The following opinion was filed June 3, 1909:

KERWIN, J. 1. It is contended on the part of each relator, but especially by the Great Northern Railway Company and the Lake Superior Terminal & Transfer Railway Company, that the proceedings to obtain a certificate of convenience and necessity were premature, because the point of crossing should have been first determined and the right to cross obtained before such certificate was granted. This contention involves the construction of the acts of the legislature set out in the statement of facts.

Subd. 6, sec. 1828, Stats. (1898), provides that if the corporations cannot agree upon the amount of compensation to be made "or the points and manner of such crossings and connections the same shall be ascertained by commissioners to be appointed by the court, as is provided in this chapter in respect to acquiring title to real estate." It is insisted that this provision is still in force, and that the point of cross-

ing must be so determined by commissioners appointed by the court, and not by the *Railroad Commission*.

Sec. 1797—56, Stats. (Laws of 1907, ch. 454), provides that "every crossing of the track of a steam railroad hereafter made by the track of another steam railroad . . . shall be above, below or at grade of the tracks proposed to be crossed as the *Railroad Commission* shall determine." And it further provides that in such determination the *Railroad Commission* shall prescribe the kind and character of the protective appliances, if any, to be installed, operated, and maintained at such crossings. Sec. 1797—40 provides for the application for certificate of convenience and necessity within six months after the publication of the articles of association, and sec. 1797—41 provides that no railroad corporation shall make application for such certificate unless it shall have caused a copy of its articles of association to be published in one or more newspapers within six months prior to the time of making the application. Sec. 1797—43 provides that every application for a certificate of convenience and necessity shall be accompanied by complete maps and profiles of the line of the proposed road, which shall be filed with the application, and that prior to granting or refusing the certificate the *Railroad Commission* shall have the right to permit errors, omissions, or defects in the application, maps, and profiles to be supplied or corrected, and also to permit changes in the proposed route where deemed desirable. Secs. 1797—45, 1797—46, and 1797—47 provide for hearing counsel and taking evidence in support of or in opposition to the application. Sec. 1797—48 provides that upon conclusion of the hearing of the application, if the *Commission* or a majority of them shall find that the proposed road would be a public convenience and that a necessity requires the construction of it, the *Commission* shall forthwith grant and issue to the applicant a certificate that public convenience and necessity require the construction of

said road as proposed, and shall approve the maps showing
the proposed route of said railroad and file the same in their
office, and the applicant shall cause a copy of such maps, cer-
tified by the secretary of the *Commission,* with the seal af-
fixed, to be filed in the office of the register of deeds in each
county in which such railroad shall be located, and such
filing shall be a condition precedent to the right of the ap-
plicant to institute and maintain condemnation proceedings
for the acquirement of land for right of way, stations, and
other necessary uses.    Sec. 1797—58 provides for a change
or alteration of the route by a vote of two thirds of the di-
rectors of said railroad, and sec. 2, ch. 454 (p. 1086), Laws
of 1907, provides for the repeal of all acts in so far as they
are inconsistent with said chapter.

It is clear, therefore, from the foregoing statutes that subd.
6, sec. 1828, Stats. (1898), is still in force, except in so far
as it is repealed by ch. 454, Laws of 1907.    Prior to the
Laws of 1907 a railroad company had the right, by a vote
of its board of directors, to locate the line of its railroad.
*In re Milwaukee S. R. Co.* 124 Wis. 490, 102 N. W. 401;
*In re Eastern Wis. R. & L. Co.* 127 Wis. 641, 107 N. W.
496.    Subd. 6, sec. 1828, Stats. (1898), as it existed before
the passage of ch. 454, Laws of 1907, provided that in case
of crossing of one railroad by another, where the corpora-
tions could not agree upon the amount of compensation "or
the points and manner of such crossings and connections,"
the same should be ascertained by commissioners to be ap-
pointed by the court.    Ch. 454, Laws of 1907, we think obvi-
ously was intended by the legislature to authorize the *Rail-
road Commission* to settle the question of crossing which by
the former law was to be settled by commissioners appointed
by the court, and therefore the right of the *Railroad Com-
mission* to determine whether such crossing should be above,
below, or at grade of the tracks proposed to be crossed, in
view of the different statutes above referred to, vested the

*Railroad Commission* with power to determine the point of crossing as well as whether it should be above, below, or at grade. The provisions of the statutes requiring maps and profiles to be filed with the *Railroad Commission,* describing particularly the location of the proposed road, and the provisions with reference to the approval of such maps and profiles and filing the same, seem clearly to indicate the legislative intention that the action of the *Railroad Commission* was to be based upon the particular line indicated in the papers filed with it for its action, except in so far as errors might be corrected and changes made as provided under the law heretofore referred to. We think, therefore, it logically follows, reading all the provisions of the statute together, that the *Railroad Commission* is authorized to determine the point of crossing as well as the manner, and in passing upon the application the point of crossing is included in the determination of the manner. In many cases at least the point of crossing would have a bearing upon the manner of crossing, whether above, below, or at grade. Besides, the *Commission* under the law is authorized to pass upon the application presented and described in the maps and profiles and not upon some other or different route. We do not see how the legislature could have intended to vest in the *Railroad Commission* the authority to pass upon the manner of crossing and withhold the power to determine the point of crossing, since each is in a degree involved in the determination of the other.

The argument is that commissioners should be first appointed by the court to determine the point of crossing and the damages. But this would seem to be an awkward and impractical execution of the statute; for, until the manner of crossing was determined, it is difficult to see how the commissioners could intelligently assess the damages. Nor could they as well determine the point of crossing until the manner was determined. In fact, it seems the most reasonable and practical construction of the statute would require

that the determination of both point and manner of crossing should rest with the same tribunal, and we think such was the intention of the legislature. That the law as it existed before the passage of ch. 454, Laws of 1907, respecting the right of the railroad company to designate its route, was not abrogated by the latter law, was ruled by this court in a late case. *Eastern R. Co. v. McCord,* 136 Wis. 249, 116 N. W. 841.

It is manifest that the line of road designated in the maps and profiles was intended by the legislature to be the line upon which the *Railroad Commission* was to act in determining whether the crossing should be at grade or otherwise, and provision was therefore made for the correction of errors, omissions, or defects in the application, maps, and profiles, and that certified copies of the maps be filed in each county through which the road was to run, doubtless for the purpose of making a record of the land sought to be acquired for the road. The provisions of sec. 1797—58 also bear evidence of legislative intention to give the *Railroad Commission* power over the determination of point of crossing. · It provides for change of route by filing a map with the *Railroad Commission* and register of deeds where the original map fixing the location is filed, and further states:

"Provided that such alteration or change shall not deviate from the original route of such railroad as approved by the *Railroad Commission* for a greater distance than one mile."

Our attention is called to *Olean S. R. Co. v. Pa. R. Co.* 75 App. Div. 412, 78 N. Y. Supp. 113, as controlling on this point. But the New York statute under which this decision was rendered is quite different from ours, and therefore the decision does not shed much light upon the construction of our statute. A careful examination of all the provisions of our statutes upon the subject convinces us that the *Railroad Commission* is vested with power to determine the point as well as the manner of crossing, and that the question of

compensation only under the law is left to the commissioners appointed by the court. 3 Elliott, Railroads, §§ 1119, 1120; *People ex rel. Depew & S. W. R. Co. v. Board of R. R. Comm'rs,* 4 App. Div. 259, 38 N. Y. Supp. 528.

2. The crucial question in the case is the distribution of burdens between the contending companies, namely, what portion of the expense occasioned by the crossing must be borne by the junior company, or company seeking to cross the old road. The right to cross before as well as after the passage of ch. 454, Laws of 1907, is unquestioned; likewise the right of the senior road to some compensation. But the court below as well as the *Railroad Commission* held that the expense of maintaining the crossing and the cost of construction and maintaining the interlocking, derailing, and signal system should be borne one half by each road. This conclusion is based upon the right of the state to alter or repeal the charter of the senior company and also under the police power. The right to alter or repeal existing charters is not without limitation when the question of vested property rights under the charter is involved. The power is one of regulation and control, and does not authorize interference with property rights vested under the power granted. *Comm. v. Essex Co.* 13 Gray, 239; *Sinking-Fund Cases,* 99 U. S. 700; *Shields v. Ohio,* 95 U. S. 319; *Miller v. State,* 15 Wall. 478; *Holyoke Co. v. Lyman,* 15 Wall. 500; *Pearsall v. G. N. R. Co.* 161 U. S. 646, 16 Sup. Ct. 705. The doctrine is well stated in *Sinking-Fund Cases,* 99 U. S. 700, 720, as follows:

"That this power has a limit no one can doubt. All agree that it cannot be used to take away property already acquired under the operation of the charter or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made. . . ."

The reserve power stops short of the power to divest vested property rights, and is embodied in the state constitution for the purpose of enabling the state to retain control over cor-

porations, and. must be construed in connection with the other provision of the constitution to the effect that private property shall not be taken for public use without compensation. It follows, therefore, "that where, under power in a charter, rights have been acquired and become vested, no amendment or alteration of the charter can take away the property or rights which have become vested under a legitimate exercise of the powers granted." *Comm. v. Essex Co., supra.* Moreover, the power to alter or amend is a reserved power in the interest of the state to modify or repeal its own contract with the corporations. *Tomlinson v. Jessup,* 82 U. S. 454; *State v. C. & N. W. R. Co.* 128 Wis. 449, 108 N. W. 594.

The appellant acquired its right of way and constructed its road under the provisions of the laws of this state, and while subd. 6, sec. 1828, Stats. (1898), was in force and unmodified, which subdivision provided:

"But no corporation which shall have obtained the right of way and constructed its road at the point of intersection before the application for the appointment of commissioners may be made shall be required to alter the grade or change the location of its road, or be required to bear any part of the expense of making and maintaining such crossing or of such proceeding."

So under this statute in force at the time appellant constructed its road there can be no doubt that railroads thereafter crossing were required to pay all the expense of constructing and maintaining such crossing. This statute is in harmony with the common law, as an examination of the authorities will demonstrate. *Chicago, M. & St. P. R. Co. v. Milwaukee,* 97 Wis. 418, 72 N. W. 1118; *State ex rel. Minneapolis v. St. P., M. & M. R. Co.* 98 Minn. 380, 108 N. W. 261; *Northern C. R. Co. v. Mayor, etc.* 46 Md. 425; *Dyer Co. v. Railroad Co.* 87 Tenn. 712, 11 S. W. 943; *Perley v. Chandler,* 6 Mass. 454; *Richardson v. Bigelow,* 15

Gray, 154; *State ex rel. North C. R. Co. v. N. P. R. Co.* 49 Wash. 78, 94 Pac. 907.

In *Boston & A. R. Co. v. Cambridge,* 159 Mass. 283, 287, 34 N. E. 382, the court said:

"But at common law the crossing of a new way with one already in use must be made with the least possible injury to the old way, and whatever structures are necessary must be erected and maintained at the expense of the party making the new way, and, if the old way cannot be crossed without damage, the damage must be ascertained and paid."

The appellant, therefore, having acquired its right of way under the statute referred to protecting it from all damages occasioned by the crossing by the junior road, must have a vested property right which cannot be taken for the benefit of another railway without compensation. Although the property of a railroad is devoted to public use it is nevertheless entitled to protection, subject to reasonable regulation in the interest of the public. *Eastern Wis. R. & L. Co. v. Hackett,* 135 Wis. 464, 115 N. W. 382; *Interstate Comm. Comm'n v. C. G. W. R. Co.* 209 U. S. 108, 28 Sup. Ct. 493.

In *Eastern Wis. R. & L. Co. v. Hackett, supra,* this court said:

"It is a somewhat prevalent error that property devoted to public use and subject to public regulation is thereby quite out of law, or, as Blackstone says, *caput lupinum.* The use of such property is subject to regulation, and subject to interference by the public authorities with the dominion of the owner to a far greater degree than private property, because of its *quasi*-public character, and because of the tendency to abuse or extortion in its use and management. But, subject to this limitation, the owner of such property has the same rights in his property as any other owner. He may insist upon his own price therefor, except as against the power of eminent domain. He may insist upon all the advantages of location and all the advantages of existing contracts, so long as he does not run counter to reasonable and lawful regulations concerning the use of such property."

And in *W. U. Tel. Co. v. Pa. R. Co.* 195 U. S. 540, 25 Sup. Ct. 133, it is said:

"A railroad's right of way has, therefore, the substantiality of the fee, and it is private property even to the public in all else but an interest and benefit in its uses. It cannot be invaded without guilt of trespass. It cannot be appropriated in whole or part except upon the payment of compensation. In other words, it is entitled to the protection of the constitution, and in the precise manner in which protection is given. It can only be taken by the exercise of the powers of eminent domain, and a condition precedent to the exercise of such power is, we said in *Sweet v. Rechel* [159 U. S. 380], that the statute conferring it make provision for reasonable compensation to the owner of the property taken."

Upon the proposition that under the reserve power in the constitution vested property rights cannot be taken away or destroyed without compensation, the following cases are in point: *Detroit v. D. & H. P. R. Co.* 43 Mich. 140, 5 N. W. 275; *Hill v. Glasgow R. Co.* 41 Fed. 610; *San Joaquin & K. R. C. & I. Co. v. Stanislaus Co.* 113 Fed. 930; *Shields v. Ohio,* 95 U. S. 319; *State v. C. & N. W. R. Co.* 128 Wis. 449, 108 N. W. 594.

It seems clear, therefore, under the authorities, that the appellant when it constructed its road prior to the passage of ch. 454, Laws of 1907, acquired a vested property right which cannot be divested without compensation under the reserve power to alter or amend its charter. That the expense of constructing and maintaining the crossing, including the interlocking and derailing system, will be great is without dispute. It is equally clear that this expense is occasioned through the crossing by the junior road, and to compel the senior road to pay any part of such expense is manifestly a taking of the property of the appellant. While it may be conceded that the safety devices are necessary and properly within the power of the *Commission* to order, it is also true that the necessity of such devices was caused by the crossing

by the junior road. The question, therefore, is one of distribution of burdens between the senior and junior roads. That there is no authority of law to lay any portion of this burden upon the senior road under the power to alter or amend its charter (sec. 1, art. XI, Const.) we think is clear.

The question arises whether any portion of the burden can be imposed upon the senior company under the police power. The main contention of counsel for respondent to support the order of the *Railroad Commission* in apportioning a part of the expense of the crossing to the appellant is based upon the police power, and that the act of the legislature (ch. 454, Laws of 1907) is a legitimate exercise of such power. The particular scope of the police power has been the subject of much judicial discussion. In the late case of *State v. Redmon,* 134 Wis. 89, 114 N. W. 137, it is said that in the multitude of attempts which have been made to define it not much has been added to the simple expression that it is the power to make all laws which in contemplation of the constitution promote the public welfare, and the controlling question in considering the scope of the police power is whether the manner of dealing with the subject in the particular case "so passes the boundaries of reason as to overstep some constitutional inhibition, express or implied." The question of the scope of police power has been discussed in numerous decisions of this court, and further general discussion would seem useless.

If the act in question (ch. 454, Laws of 1907) were construed as contended by counsel for respondent, namely, that the *Commission* has power to apportion the cost of the crossing between the roads as it did and without remedy for appellant's damages, it would be unconstitutional and not a reasonable exercise of the police power, because such a construction would amount to a taking of the property of appellant and transferring it to respondent without compensation. We do not think the act should have such construction, and we

believe it is capable of one which will render it constitutional. That the *Commission* had the right to order the interlocking, derailing, and signal system may be conceded, since, in view of the conditions created by the crossing, some such regulation was doubtless necessary.    But it was necessary because of the crossing by the junior road, and without such crossing would be unnecessary.    The *Railroad Commission* and the court below seem to have been of the opinion that under the law the *Commission* was bound to apportion the costs of crossing between the two roads, and that the statute is mandatory upon the subject.    True, the law provides that the *Commission* "shall also fix the proportion of the expense of originally constructing, operating and maintaining such crossing, and of any protective appliances prescribed by them and the proportion of the expense of operating and maintaining the same which shall be paid by the owners of said tracks respectively."    The act must have such construction as will save it from infringing the constitution, if it will bear such construction.    Now, while the language of the act may support the construction claimed for it by respondent, we think it capable of a construction which would not require the *Railroad Commission* to impose any part of the expense of the crossing upon the senior road which would result in a taking of its property without compensation; as, for example, all damages occasioned by the crossing might be adjusted in the condemnation proceedings, and thus the equal status of the roads as to future burdens established, and perhaps other conditions might arise in cases where a part of the expense of the crossing might be charged to the senior road without violating any constitutional principle. We shall not attempt to anticipate what cases or conditions might arise which would justify charging part of the expense to the senior road.    It is sufficient to say that such construction cannot be given the law as would result in taking the property of appellant for the benefit of respondent

without compensation. But, returning to the question of right to impose the burden of one half of the expense of the crossing under the police power upon the senior road, and conceding that it was within the power of the *Commission* to order such system, the order cannot be sustained except on the idea of payment of damages to the senior road.

Counsel for respondents seek to support their position on the authority of cases regarding public street crossings. But the distinction between the two classes of cases is quite clearly marked. In the first place, the "ways," as pointed out in the decisions of some courts, are not of the same general nature. Among other points of distinction which may be suggested it may be observed that a street or public highway is opened and used, not for revenue, but solely for the benefit of the general public. While it is true a railroad has some of the attributes of a public highway, in that it is a common carrier of freight and passengers, yet it is owned by private parties and operated and used as other private property for gain, subject to public control, because devoted to a public purpose. And so the common-law rule respecting the distribution of the burden caused by the crossing of "ways" has been held to apply to "ways" of the same general nature. *State ex rel. Minneapolis v. St. P., M. & M. R. Co.* 98 Minn. 380, 108 N. W. 261; *Chicago, M. & St. P. R. Co. v. Milwaukee,* 97 Wis. 418, 72 N. W. 1118. And in *Toledo, A. A. & N. M. R. Co. v. D., L. & N. R. Co.* 62 Mich. 564, at p. 566 (29 N. W. 503), speaking on a statute similar to ours, the court said:

"But I can find no authority for compelling the company whose road is crossed to pay any part of the expense of making or constructing the crossing. Certainly, it is not for its interest to have its property thus used; and while the company in accepting its franchise must be regarded as having done so upon the condition that its road might be thus crossed upon being paid reasonable compensation therefor, there can be no presumption that it ever consented to pay for the privi-

lege of being thus injured. I know of no law or principle which will compel one company to build and maintain a railroad track for another or to furnish the money necessary for that purpose; and to the extent that this section of the statute requires this to be done in this class of cases it is repugnant to the constitution."

In *Flint & P. M. R. Co. v. D. & B. C. R. Co.* 64 Mich. 350, 31 N. W. 281, it was held that in condemnation proceedings by one railroad for the right to cross another, the cost of maintaining signals, a crossing system, and watchman were proper elements of damages. In *State ex rel. North C. R. Co. v. N. P. R. Co.* 49 Wash. 78, 94 Pac. 907, the court held that the burden of maintaining an interlocking device at the point of crossing was an actual damage to the senior road and that such was the result of the crossing, and therefore it should be charged to the road for whose benefit the damage was occasioned. In *Butte, A. & P. R. Co. v. M. U. R. Co.* 16 Mont. 504, 41 Pac. 232, it was held that the expense of a watchman at the crossing should be imposed upon the new road. In *West Jersey & S. R. Co. v. Atlantic City & S. T. Co.* 65 N. J. Eq. 613, 622, 56 Atl. 890, 894, the court said:

"There seems to be no equitable ground which requires the senior company presently in occupation to pay anything to enable the junior company to construct its own crossing in such a manner that it shall not impair rights of the senior company already vested and in enjoyment. It is the duty of the junior company so to build its tracks over the senior company's rails that the crossing may be safe."

To the same effect are the following cases: *Winona & S. W. R. Co. v. C., M. & St. P. R. Co.* 50 Minn. 300, 52 N. W. 657; *Elkins E. R. Co. v. W. M. R. Co.* 163 Fed. 724; *St. Louis, J. & C. R. Co. v. S. & N. W. R. Co.* 96 Ill. 274; *Chicago & W. I. R. Co. v. E. C. R. Co.* 115 Ill. 375, 4 N. E. 246.

It would be useless to attempt a general review of all the

authorities. We shall refer, however, to some of the cases mainly relied upon by the respondents; and in considering the authorities it must be borne in mind, as before stated, that the question here is not as to when and under what circumstances the state can, under the reserve power, alter or amend its contract with the corporation or take property under a reasonable exercise of the police power in the interest of the public, but whether it can take the property of one lawfully acquired under legislative authority and give it to another without compensation to the owner. In *Chicago, St. P., M. & O. R. Co. v. C., M. & St. P. R. Co.* 113 Wis. 161, 87 N. W. 1085, 89 N. W. 180, the question arose under a contract as to the meaning of "other similar appliances," and it was held that they did not include an interlocking system, since such system could not have been in the contemplation of the parties when the contract was made. The question arose under a contract between the two companies, parties to the contract, while here the *Commission* determined what shall constitute a proper crossing. In *Railroad Commission Cases,* 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, the question was as to the right of the state to regulate rates and fix a minimum transportation charge. In *Pennsylvania R. Co. v. Miller,* 132 U. S. 75, 10 Sup. Ct. 34, the question arose as to the right, under a change in the constitution of the state, to recover consequential damages in a condemnation proceeding, and the court held that, since there was no exemption from future liability for such damages, it took its charter subject to such liability created by general law in respect to the subject matter involved. In *Chapin v. Crusen,* 31 Wis. 209, the case grew out of a ferry franchise which was held to be a mere license, and even in that case the court recognized the doctrine that vested property rights could not be destroyed. *Chicago & A. R. Co. v. Joliet, L. & A. R. Co.* 105 Ill. 388, is where the question arose on stipulation entered into between the roads. *Cincinnati, I. & W. R. Co. v. Con-*

*nersville,* 170 Ind. 316, 83 N. E. 503, involved the question of right to damages occasioned through compliance with police regulation.    *Grand Trunk W. R. Co. v. Railroad Commission,* 40 Ind. App. 168, 81 N. E. 524, involved contract rights between the roads respecting an interlocking system. *Northern P. R. Co. v. State ex rel. Duluth,* 208 U. S. 583, 28 Sup. Ct. 341, holds that the police power of the state cannot be contracted away.

Many other cases cited by respondents involve the exercise of the police power, and where no question of vested property rights between the roads existed, and crossings of streets or public highways.    The case most in point cited by respondents is *Lake Shore & M. S. R. Co. v. C., S. & C. R. Co.* 30 Ohio St. 604.    This case appears in a degree to support the respondents' contention, although it recognizes the right of the senior road to have compensation for its property. The case does not seem to rest on a statute like ours (subd. 6, sec. 1828, Stats. 1898), and if any such statute existed in Ohio at the time the road was built, which we fail to find, it was not considered by the court as controlling in any way in the case.    We have seen from the authorities cited that the crossing road at common law was bound to restore the senior road as far as possible to its former serviceableness and pay all damages occasioned by the crossing, and our statute referred to manifestly was passed to protect that property right and remove any question on the subject.

3. It is further contended by counsel for appellant that ch. 454, Laws of 1907, is invalid, since it purports to invest the *Railroad Commission* with power to fix the proportion of the expense of crossing, and is therefore a delegation of legislative power or a vesting of the *Commission* with judicial power.    We do not regard this position tenable.    *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Commission,* 136 Wis. 146, 116 N. W. 905; *Madison v. Madison G. & E. Co.* 129 Wis. 249, 108 N. W. 65; *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 87 N. W. 561; *Nash v. Fries,* 129 Wis.

120, 108 N. W. 210; *Dowling v. Lancashire Ins. Co.* 92 Wis. 63, 65 N. W. 738; *Union B. Co. v. U. S.* 204 U. S. 364, 27 Sup. Ct. 367.

4. It is settled that unless the order of the *Railroad Commission* be unlawful or unreasonable it cannot be disturbed. *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Commission,* 136 Wis. 146, 116 N. W. 905. The *Commission,* as appears from its opinion printed in the record by the respondents, indicates that it considered under "the plain mandate of the statute" that it was compelled to distribute the burden as it did, and that it was not concerned with the elements of damage to which the appellant was entitled under subd. 6, sec. 1828. The court below seems to have taken the same view, as appears from the memorandum opinion filed, in which it is said that if the appellant has the right to recover such expenses that is a matter to be considered by the condemnation commission. It is quite obvious, therefore, that both the *Railroad Commission* and the court below were in doubt as to what damages should be recovered in the condemnation proceedings, and intended to leave that matter for future determination. If the purpose of the *Railroad Commission* in making the order, and the court in affirming it, was to negative the right of the appellant to recover the damages caused by the crossing, including maintenance of the crossing and construction and maintenance of the interlocking, derailing, and signal system, the *Commission* and court were wrong and acted without authority in that regard. But, on the other hand, if the purpose was to apportion the expense to be charged to each road in the future, leaving the amount of damages occasioned by the crossing to be awarded by the commissioners appointed by the court in the condemnation proceedings, then the order of the *Commission* is within the law. This seems to have been the theory of the *Commission* and the court below, and we think is the most practical and workable construction of the statute.

It follows from what has been said that upon the case made

the appellant should recover in the condemnation proceedings all damages caused by the crossing of the senior road by the junior road, including cost of grading, rails, frogs, switches, and other appliances used in constructing and maintaining the crossing, as well as the cost of constructing and maintaining the interlocking, derailing, and signal system. The judgment should therefore be modified so as to make clear this idea.

·· *By the Court.*—The judgment of the court below is modified so as to affirm the order of the *Railroad Commission* without prejudice to the appellant's right to recover all damages as indicated in this opinion, and as so modified is affirmed. No costs are allowed either party upon this appeal, except that respondents pay the clerk's fees.

The following opinion was filed June 4, 1909:

BARNES, J. (*dissenting*). The senior line of road is not benefited theoretically or practically by having its tracks crossed by those of the line subsequently built. The public is not interested in requiring the senior line to pay any part of the expense of such crossing, and so much of sec. 1797—56, Stats. (Laws of 1907, ch. 454), as empowers the *Railroad Commission* to require the senior line to defray any portion of the expense of constructing a crossing proper is void because it deprives the company of its property without due process of law, in violation of the XIVth amendment to the federal constitution. This particular provision of the law may well be held void without jeopardizing the remaining portion of the act.

No part of the expense of constructing the crossing proper was assessed against the senior lines in this case, although they were required by the *Commission* to defray one half the expense of maintenance. In the absence of any showing that such expense was a material item, or that the amount

the senior lines would be called upon to pay would exceed the cost of maintaining their respective roads at the point of intersection had no crossing been made, the order of the *Commission* was not erroneous.

The court treats the crossing and the interlocking device as being one and the same thing. It seems to me that this conclusion is fundamentally wrong. It is true the crossing creates the necessity for the interlocking plant, if necessity there is, but it is also true that it is perfectly feasible to operate railroads without it. There were numerous grade crossings before such devices were invented, and there are still numerous crossings at grade where no such device is used. An interlocking plant is primarily a safety device, calculated to protect the lives and limbs of passengers and train employees. Secondarily, it is a device calculated to facilitate traffic and commerce. It is not a crossing. The junior road has the right under the statute to cross the senior line. Such right existed when the roads of the appellant companies were built. When that right is exercised, it is as important that the employees and the patrons of one line be protected as it is that those of the other should be; and it is likewise as essential that commerce be not impeded on the one line as it is on the other.

The state has the undoubted right in the exercise of its police power to require railway companies to install safety devices such as interlocking plants, whenever in the exercise of any reasonable judgment the public safety or convenience requires such installation. This is true as to roads that were constructed a half century ago, and it is true of roads that are constructed at the present time. It is conceded in the opinion of the court that this right exists, but only in a restricted way. The court holds that such power of regulation can be exercised only when the junior road is required to defray the entire expense of the safety appliance used for the protection of persons on both roads. Herein it seems to

me that the court has departed from sound legal principles well-nigh universally recognized, and has confounded the power of the state in the exercise of eminent domain with its exercise of police power.    Our constitution prevents the taking of private property for public use without just compensation.    Compensation has never been required or considered as a necessary element in the exercise of police power. If the necessity exists for the exercise of the power it may always be exercised, regardless of whether private property is taken or not.    So the question here is, not what the expense of the interlocking plant will be, or who shall bear the burden of its instalment, but, Does the public safety or the public convenience require that it be installed ?    If this fact exists, the power of the state is plenary to order the installation and to make such provision in regard to the division of expense as it deems just.    In the exercise of this power it may order the removal of expensive industrial plants that were not originally but have become nuisances by reason of the growth of the cities in which they are located.    It may tear down dangerous structures, may destroy liquor unlawfully kept for sale, may establish quarantine regulations, may destroy animals afflicted with a contagious disease, may raze buildings to prevent the spread of conflagrations, and may do many other things too numerous to mention, and all these things may be done without an iota of compensation to the persons damaged.    If it be conceded, as it seems to be, that the police power may be invoked to require safety devices to be installed, there is little support in the authorities for the position that the state may not apportion the expense between the carriers affected.    Freund, Police Power, § 511 et seq.    I see no reason why the state may not require safety devices such as interlocking plants to safeguard crossings, regardless of whether such crossings are made before or after the passage of the law requiring the devices to be used.    The power to require the device necessarily carries with it the

power to determine who shall bear the burden. There is, in my opinion, no more reason for requiring the junior road to. bear the entire burden of such a device where the crossing· was made in 1908 than there would be in requiring such a. road to bear the entire expense of an interlocking plant in connection with a crossing made forty years ago. As population and traffic increases, the use of such devices will become more general, and it is apparent that such devices will. be installed at crossings where for a long series of years none· have been maintained. Under the very act we are consider-- ing, the *Commission* might have found that no necessity existed for the constructing of an interlocking plant. It is, however, expressly authorized at any time in the future to order such a plant to be constructed if the public good so requires. If such construction were ordered after the right of way had been condemned, then certainly the senior road could not be reimbursed for its part of the outlay in any con-- demnation proceeding.

No very clear legislative declaration is made in the law of ˙ 1907 requiring railway companies to adopt and install approved safety devices whenever necessary to protect life or· to facilitate commerce, although such declaration may be fairly implied from the language used. In the absence of such provision, express or implied, in the law, it would be difficult to say that it did not confer legislative power upon the *Commission* under the rule of *State ex rel. Adams v. Burdge,* 95 Wis. 390, 70 N. W. 347; *Dowling v. Lancashire*· *Ins. Co.* 92 Wis. 63, 65 N. W. 738; *In re North Milwaukee,* 93 Wis. 616, 67 N. W. 1033, and kindred cases. It being· the policy of the legislature to require such appliances to be installed whenever reasonably necessary, the legislature may constitutionally delegate to the *Commission* the power to determine the fact as to whether or not the necessity exists for an interlocking device at a given point. When such deter-- mination is made, it becomes incumbent on the railroads af--

fected to install the device. It is competent for the legislature to make any reasonable apportionment of the expense of such device, and it may delegate to the *Commission* the right to make such apportionment. I do not think there is any inequity in requiring the junior and senior railroads affected to contribute equally to the expense of constructing and maintaining a safety device where the benefits to be derived are substantially equal. In any event, the legislature has the right to make the apportionment, and its apportionment is final unless it palpably violates some constitutional provision in so doing. The division of expense made in this case by the *Commission* stands on the same footing as if made by the legislature.

Sec. 1797—56, Stats. (Laws of 1907, ch. 454), clearly empowers the *Commission* to determine and apportion the cost of the protective appliance and of the expense of operating and maintaining the same between the senior and junior lines, and further provides that the expenses so apportioned shall be paid by the companies to which they are apportioned.

I do not think it was the intention of the legislature to permit the senior line to recover back from the junior line, in condemnation proceedings or otherwise, the amount required to be paid by the senior line under sec. 1797—56. There is no language in the act from which such a right can be implied. The plain ordinary meaning of the statute is that what is paid by the senior line is paid for a device that will inure to its benefit as well as to the benefit of the junior road, for the recovery of which no right exists. It seems to me to be an unjustifiable construction of the statute to hold that it means otherwise. It is a purely senseless proceeding to require the senior road to contribute to the construction in the first instance and then require a like amount of money to be refunded to it. The legislature should be acquitted of intending anything so childish. Indeed, the court holds that it adopts its construction of the law, not because it is the

State ex rel. Northern Pac. R. Co. v. Railroad Commission, 140 Wis. 145.

reasonable one, but because it is necessary to do so to avoid declaring it unconstitutional.

The construction adopted by the court is impracticable and cannot be carried out. A money award only can be made in condemnation proceedings. It is impossible to make such an award to cover maintenance expenses. No one can determine when the earth will cease to exist, or is wise enough to say that these roads will not be operated for all time.

Sec. 1797—56 directly negatives the construction placed thereon by the court. Condemnation proceedings are usually instituted and carried on before the new road is actually constructed, and must be so carried on if the landowner so elects. The *Commission* may not in the first instance require safety appliances to be installed at all. If the exigencies of business later require installation, the *Commission* may at any time order the appliances to be put in. If, in this case, no interlocking plant had been ordered by the *Commission,* could the expense of such a plant be charged to the junior road in condemnation proceedings based upon the contingency that such a plant might be ordered at some time in the future? I think not, and that, if installation were ordered five or ten years hence, there would be no doubt under the law that both roads might be required to share in the expense.

It is said in the opinion of the court:

"The right to alter or repeal existing charters is not without limitation when the question of vested property rights under the charter is involved. The power is one of regulation and control, and does not authorize interference with property rights vested under the power granted."

I desire to expressly record my dissent from the quoted part of the opinion. Sec. 1, art. XI, of our constitution empowers the legislature to enact laws for the formation of all corporations without banking privileges. It expressly provides that "all general laws or special acts, enacted under the

provisions of this section, may be altered or repealed by the legislature at any time after their passage." There is no limitation on the right of the legislature to repeal corporate charters except the consciences of the legislators, and no limitation on the right of amendment except the XIVth amendment to the federal constitution. The state may not confiscate the property of corporations to itself, but the incidental loss that may result from the repeal of a corporate charter is one that every corporation knowingly faces and assents to when it elects to incorporate under the laws of the state. This provision of our constitution was advisedly inserted to obviate the effect of the decision of the supreme court of the United States in the *Dartmouth College Case*, 4 Wheat. 518. It is too plain to admit of more than one meaning or interpretation and too important to be frittered away by inadmissible construction.

I think the order of the circuit court should be affirmed, and that the appellants are not entitled to recover in condemnation proceedings any part of the expense of installing the interlocking plant.

WINSLOW, C. J., concurs in the foregoing dissenting opinion.

The following opinion was filed June 9, 1909:

MARSHALL, J. (*concurring*). It escaped my attention till after the court's opinion was filed that it is there suggested that the question of whether proceedings to obtain the certificate of public necessity and convenience were premature was involved on this appeal. That is hardly accurate. Such proceedings were necessarily commenced and concluded under sec. 1797—48, Stats. (Laws of 1907, ch. 454), and preceding sections before this proceeding was instituted. The former related to general right to construct the road. The latter to manner of constructing it, including crossings of

other roads and the construction, maintenance, and operation of necessary safety devices at such crossings, and necessarily required, as hereafter indicated, preliminary thereto the locating of such crossings. The right to cross other railroad tracks is referable to subd. 6, sec. 1828, Stats. (1898). The authority, in case of disagreement, to fix the place of any such crossing is also referable to such subdivision, unless it is superseded by the act of 1907, which appellant denied. No location of the crossing in question had been made under the old law, therefore appellant contended this proceeding, following in logical order the preliminary one to obtain the initial certificate, was prematurely commenced.

The act of 1907 did not expressly supersede the old law as regards authority to locate crossings. It did, as indicated in the decision, confer such power as to things made the subject matter of this proceeding, as, by necessary implication, to carry therewith power to locate the place of crossing any other road, thus repealing the old law on the subject. So it was held, this proceeding was not prematurely brought because power to locate the place of crossing of another road is incidental to the power sought specially to be exercised.

By oversight, I think, the declaration appears in the opinion that the reserve power in the constitution to alter, amend, and repeal corporate charters is "one of regulation and control." The court did not intend to go further than *Sinking-Fund Cases,* 99 U. S. 700, cited to the effect that such power does not extend to authority to take away property acquired under a corporate charter.

The trial court is acquitted in the decision, I understand, of having determined that, in the ultimate, the senior road must bear any of the burden of the crossing or its accessories, either of construction, maintenance, or operation. It is held that the order and judgment merely create a status to be dealt with in condemnation proceedings, and that so far as it and its consequences would otherwise be, by appropriation of its

property, to the permanent pecuniary injury of appellant as compared with the situation without the new crossing, the commissioners in such proceedings should award a money equivalent, and that a construction of the act of 1907 to that end is reasonable and necessary to save it from condemnation as unconstitutional.

The decision of the court recognizes that the judgment complained of, following the determination of the *Railroad Commission,* in creating a status to be dealt with in condemnation proceedings, imposed upon the junior road the burden of making the crossing, furnishing all labor, material, and appliances to that end. The decision, now, as I understand it, merely provides for the ultimate imposition upon such road, by its paying to the appellant a money equivalent for the burden left upon it otherwise, by the status created by the judgment. The purpose of the concluding words of the opinion was, as I understand it, to cover the idea that appellant should recover in the condemnation proceedings on that basis; that is for all damages caused to it by a change of its property status to its pecuniary loss by appropriation of such property to the use of respondents, including the cost to it, the appellant, of grading, rails, frogs, switches, etc., in view of what is required of the junior road by the judgment, which requirement is left undisturbed except as indicated. The concluding paragraph of the opinion should not be read as requiring the commissioners, in the condemnation proceedings, to award appellant compensation for the very things the judgment requires respondents to furnish in place. That appears plainly by reading such concluding paragraph in the light of what precedes it.

I do not understand the court's determination goes further than the precise situation dealt with, *i. e.* the awarding of damages to be made by commissioners in the condemnation proceedings in case of a status created as in this case. It has nothing to do with distribution of burdens in case of

compulsory installation of a safety device at an existing crossing.

As already indicated, it is a mistake to suppose the construction of the act of 1907 by this court is not adopted because reasonable, but because it is necessary to save the law. It is the court's duty to adopt such reasonable construction of a law as is necessary to avoid condemning it as unconstitutional, and the one adopted here was taken as both so necessary and reasonable and in accord with the legislative idea.

Again it would be a mistake to suppose there is any question under the decision as to competency of the state, by virtue of its police power, to compel the installation of safety devices at an existing railway crossing upon reasonable conditions, including an equal distribution of the burden caused thereby as one of such conditions. But a firm maintenance of that salutary principle does not necessitate holding that it would be reasonable to thus burden two roads equally in the circumstances of this case.

It may, at first blush, appear difficult in condemnation proceedings to fix a money equivalent for one half of the burden of the indefinite maintenance and operation of a crossing and its safety devices, but it seems the idea that it is fraught with insurmountable difficulties is more imaginary than real. It may well be said that much more difficult problems than that are often met with in condemnation and other judicial proceedings. Upon proper evidence and competent data, not difficult to present, human judgment can easily encompass such a situation.

It should not be supposed that every legislative regulation, which to any extent is in the field of police power, may unquestionably be made regardless of its effect upon private rights as regards taking property for public purposes without rendering compensation therefor. There is no governmental function, which, rightly understood and administered, is more beneficial to life, liberty, and the pursuit of

happiness than the police power, but which, not rightly understood and administered within its constitutional limitations, is more liable to be destructive of the very rights governments are instituted to conserve.  It is only in recent years that it has come to be fully appreciated that such power is not without constitutional limitations; that every exercise of it, to be constitutional, must answer for legitimacy at the bar of reason enthroned in the very spirit of the fundamental law.

True, the police power is one of necessity.  Anything which may properly be done, referable thereto alone, so far as it affects property rights may be done without rendering compensation.  But if every regulation, justifiable to any extent by the police power, could be made without reference to the power of eminent domain or any other, private rights would be exceedingly insecure.  The power of eminent domain and the police power are radically different.  The latter relates to regulation, yet its exercise may, in many instances, result in a practical taking of private property for public purposes.  The former relates, in the broad view, to any appropriation of private property for such purposes other than by the supreme necessities of war or the power of taxation, which is not within the field of legitimate mere police regulation.  Though exercise of the police power is grounded on necessity and the public welfare, so is that of either of the others.  The aggregate of private wealth of the nation, in the broad view, is the property of the nation for public purposes, in that, in the various ways suggested, under constitutional safeguards, it is subject to be laid hold of under the powers inherent in sovereignty for such purposes, sometimes by one power alone and sometimes by another, and sometimes by one as the primary force with another as auxiliary thereto, according to the appropriateness of the instrumentality or instrumentalities to fit the particular situation to be dealt with.  Where the purpose is legiti-

State ex rel. Northern Pac. R. Co. v. Railroad Commission, 140 Wis. 145.

mate and the means are legitimate, in that they do not un-
duly regulate so as to unreasonably work a deprivation of
private property rights in case the burden is cast absolutely
upon proprietors, the police power alone fits the case.  Where
the regulation goes beyond that point, some auxiliary power,
as the power of eminent domain, is necessary to avoid the
element of unreasonableness.  In that there is no confusion
of powers.

Any supposed confusion in such a case as that last indi-
cated is imaginary rather than real.  It may spring from
want of appreciation that one of the sovereign powers re-
ferred to may be, and often is, necessarily used as auxiliary
to another in order to legitimately accomplish a particular
legitimate result.  If one puts his shoulder to the wheel,
supplementing the power at the pole, and by the added ele-
ment motion is produced, there is no confusion of the former
with the latter.  There is simply a primary and auxiliary
force, each distinct from the other, operating to a single end.
With the absence of either the thing to be accomplished
would remain undone.  These principles I deem to be fun-
damental and so forego authoritative citations to support or
illustrate them.  Such is the philosophy of the law in its
scientific aspect, as I view it, and removes many of the sup-
posed mysteries of the police power, particularly as to where
it ends as regards interfering with private possessions and
the power of appropriation requiring a money equivalent be-
gins.  The dividing line between the two is sometimes shad-
owy.  It is less so according as we appreciate the legitimacy
of the two powers being wedded, so to speak, when necessary
in particular circumstances.  The line is primarily for legis-
lative ascertainment within fundamental limitations, and
its wisdom should prevail in any case unless manifestly
wrong beyond reasonable doubt.  But whether it is or is not
wrong, in any given circumstances, is a judicial question.
That the constitutional instrumentality to decide primarily

and the one to decide ultimately should each act considerately and fearlessly and with becoming deference to the other, is the concept of our system. Any difference resulting in the performance of duty does not rightly suggest criticism of either.

We may well concede that the public in such a case as this would be benefited by the construction and maintenance of the safety device, but the junior road would be enriched to the full amount it would be required to render the senior road, in that the former could not be constructed without the benefit of the crossing and the latter would be correspondingly impoverished if it were not for the compulsory exchange of equivalents under the power of eminent domain as contemplated in the judgment of the court. If the legislature contemplated the appropriation without such exchange, then the regulation, it is thought, would go beyond the legitimate domain of police power, and so, it is thought, it was not so contemplated and that this negative can reasonably be read out of the enactment in question. The construction given thereto in the court's judgment renders it sensible, reasonable, constitutional, and workable.

The judgment below having left the ultimate location of part of the burden caused by the crossing uncertain, appellant rightly conceived itself to be aggrieved and so the conclusion was reached that it should not be mulct with costs upon the appeal.

The points recognized or decided by the court, as I understand the matter, are these:

1. The right, in the general sense, to construct the road is referable to the certificate of public convenience and necessity under secs. 1797—43 to 1797—53, Stats. (Laws of 1907, ch. 454), inclusive.

2. The right to cross the track of the senior road is referable to subd. 6, sec. 1828, Stats. (1898).

3. The right to take the property of the senior road at the point of crossing is referable to such section.

4. Authority to locate the place of crossing is referable to the implied power of the *Railroad Commission* under secs. 1797—54 to 1797—56, inclusive, and the general spirit of the act of 1907, superseding, by necessary inference, subd. 6, sec. 1828, Stats. (1898), on that subject.

5. The manner of constructing the road, including manner of making the crossing with its accessories and the establishment of status in respect thereto, to be dealt with in condemnation proceedings, is referable to the decision of the *Railroad Commission* under secs. 1797—54 to 1797—56.

6. The manner of acquiring the property for the purposes of the road, including that of any other road at the crossing, is referable to secs. 1845 to 1851, inclusive, and such other parts of ch. 87, Stats. (1898), as bear on the subject, the proceedings to that end to be subsequent to the determination by the *Railroad Commission* under secs. 1797—54 to 1797—56, inclusive.

7. The commissioners in condemnation proceedings are required to deal with the situation created by the determination aforesaid making the owner of the senior road crossed good by award of a money equivalent for *such* appropriation of its property rights as shall be contemplated in view of such determination, including the cost of *such* grading, rails, frogs, switches, and other appliances used in constructing and maintaining the crossing, and maintaining and operating safety appliances, as shall be preliminarily entailed upon it in view of *such* determination.

A motion for a rehearing was denied October 5, 1909.